Filed 12/18/25

**CERTIFIED FOR PUBLICATION**

IN THE COURT OF APPEAL OF THE STATE OF CALIFORNIA

SECOND APPELLATE DISTRICT

DIVISION SEVEN

| | |
|---|---|
| CALIFORNIA APARTMENT ASSOCIATION et al., <br><br>     Plaintiffs and Appellants, <br><br> v. <br><br> CITY OF PASADENA et al., <br><br>     Defendants and Respondents; <br><br> MICHELLE WHITE et al., <br><br>     Interveners and Respondents. | B329883 <br><br> (Los Angeles County Super. Ct. No. 22STCP04376) |

    APPEAL from a judgment of the Superior Court of Los Angeles County, Mary H. Strobel, Judge. Reversed with directions.

    Nielsen Merksamer Parrinello Gross & Leoni, Christopher E. Skinnell, and Hilary J. Gibson for Plaintiffs and Appellants.

    Michele Beal Bagneris, Pasadena City Attorney, Javan N. Rad, Chief Assistant City Attorney, Dion J. O'Connell, Assistant

City Attorney; Olson Remcho, Robin B. Johansen, Margaret R. Prinzing, and Kristen Mah Rogers for Defendants and Respondents.

Strumwasser & Woocher, Frederic D. Woocher, Beverly Grossman Palmer, and Julia Michel for Interveners and Respondents.

Romy Ganschow, Chief Deputy City Attorney (Santa Monica), Alison G. Regan, General Counsel, and Matthew Brown, General Counsel (Berkeley), for City of Santa Monica, Santa Monica Rent Control Board, and Berkeley Rent Stabilization Board as Amici Curiae on behalf of Defendant and Respondent City of Pasadena.

_____

In November 2022, the voters of the City of Pasadena (City or Pasadena) adopted the initiative measure designated on ballots as "Pasadena Charter Amendment Initiative Petition Measure Imposing Rent Control." The measure, commonly known as "Measure H," added provisions to the Pasadena City Charter (Charter) pertaining to rent control and just cause evictions and established an independent rental housing board with significant authority to regulate housing, rent control, and eviction issues in the City. After the election results were certified, a group of landlords and the California Apartment Association (petitioners) filed an action seeking to prevent the City and the Pasadena City Council (City Council) from implementing and enforcing the new Charter provisions. The City, the City Council, and a group of interveners defended Measure H against the challenges. Petitioners appeal from the

2

judgment entered after the superior court rejected most of their claims, raising a number of state and federal constitutional issues.

Relying on article XI, section 3 of the California Constitution, which specifies that the voter initiative power may be used to propose amendments but not revisions to county or city charters, petitioners contend Measure H constituted an impermissible revision to the Charter. However, we conclude Measure H was not an impermissible revision of the Charter, but rather was a permissible Charter amendment.

Petitioners next challenge on two different grounds the Measure H provisions that require the City Council to appoint tenants to seven of the 11 seats on the rental housing board. First, they argue restricting eligibility to persons holding a leasehold violates the California Constitution's prohibition in article I, section 22 on conditioning the right to hold office on a property qualification. However, we construe the bar on property qualifications to mean the right to hold office may not be conditioned on the ownership of a *real property* interest. The constitutional provision thus does not bar restrictions based on a leasehold property interest. Second, petitioners contend that reserving seven of the board seats for tenants—guaranteeing a supermajority of tenants—violates landlords' and other property owners' rights to equal protection of the law under the Fourteenth Amendment to the United States Constitution. Applying a rational basis standard of review because neither landlords nor property owners are protected classes and no fundamental rights are at issue, we reject petitioners' facial equal protection challenge.

3

Finally, petitioners contend several Measure H provisions are preempted by state law. First, they assert that a provision requiring landlords to pay relocation assistance to tenants who are displaced by lawful rent increases is preempted by the Costa-Hawkins Rental Housing Act (Civ. Code, § 1954.40 et seq.). We agree. Requiring landlords to make such payments when the Act specifically authorizes landlords to increase the rent (for non-rent-controlled units) to fair market value frustrates the purpose of the Act; thus, the relocation assistance requirement is preempted. Second, with respect to landlords who wish to initiate the eviction process for nonpayment of rent, petitioners contend a new notice requirement under Measure H conflicts with the timeline for summary evictions under the Unlawful Detainer Act (Code Civ. Proc., § 1159 et seq.). We agree that this requirement presents an extra procedural barrier for landlords that contradicts the unlawful detainer statutes and is preempted. The preempted provisions are therefore void.

## FACTUAL AND PROCEDURAL BACKGROUND

Measure H, codified at article XVIII, sections 1800 to 1824 of the Charter,[1] states that its purpose "is to promote

---

[1] During the course of this case, Pasadena voters approved amendments to the Charter. We discuss and apply the current version of the Charter. https://library.municode.com/ca/pasadena/codes/code_of_ordinances?nodeId=CH [as of December 15, 2025], archived at <https://perma.cc/SP86-5XPH>; see *Make UC a Good Neighbor v. Regents of University of California* (2024) 16 Cal.5th 43, 55 ["In mandamus proceedings, a reviewing court applies the law that is current at the time of judgment in the reviewing court."].) Undesignated references to sections are to the Charter.

4

neighborhood and community stability, healthy housing, and affordability for renters in Pasadena by regulating excessive rent increases and arbitrary evictions to the maximum extent permitted under California law, while ensuring Landlords a fair return on their investment and guaranteeing fair protections for renters, homeowners, and businesses." (§ 1801.)

Measure H limits annual rent increases for multifamily rental units built before February 1, 1995 and prohibits evictions without just cause for covered residential rental units. (§§ 1804, 1806-1809.) Measure H also creates an appointed "Rental Housing Board" (Rental Board). (§ 1811.) The Rental Board is responsible for setting allowable rent increases "at fair and equitable levels to achieve the purposes of this Article," creating a rental registry and online portal designed to receive and disseminate rental housing information, and conducting proceedings on petitions seeking upward or downward adjustments of individual rent amounts. (§§ 1811-1813.) Measure H provides that "[t]he Rental Board shall be an integral part of the government of the City, but shall exercise its powers and duties under this Article independent from the City Council, City Manager, and City Attorney, except by request of the Rental Board." (§ 1811(m).)

The City's electorate voted on Measure H during the general election held in November 2022, with certified results showing the measure passed with 53.8 percent of the vote. Measure H went into effect 10 days after the results were declared at a City Council meeting on December 12, 2022. (§ 1824.)

On December 16, 2022, Ahni Dodge, Simon Gibbons, Margaret Morgan, Danielle Moskowitz, Tyler Werrin, and the

5

California Apartment Association filed a petition for writ of mandate and complaint seeking declaratory and injunctive relief. The California Apartment Association is a rental housing trade association that represents rental property owners and operators throughout the state. The individual petitioners declared they were residents of and registered to vote in Pasadena, with material interests in rental properties within Los Angeles County.

Petitioners sought an order declaring that Measure H was invalid and unenforceable and a writ of mandate or injunctive relief directing the City and the City Council to take no action to implement or enforce its provisions. Petitioners alleged Measure H: (1) revised the Charter in violation of article XI, section 3 of the California Constitution, (2) conditioned the right to hold office as a Rental Board member on a property qualification in violation of article I, section 22 of the California Constitution, (3) discriminated against landlords and property owners with respect to Rental Board membership in violation of the equal protection clauses of the California and United States Constitutions, and (4) conflicted with and was thus preempted by various state laws pertaining to residential rental units.

The City and City Council responded to petitioners' lawsuit and defended Measure H's validity. The superior court also permitted three proponents and supporters of Measure H— Michelle White, Ryan Bell, and Affordable Pasadena (interveners)—to intervene as defendants and respondents.[2]

---

[2] Unless noted otherwise, we refer to the City, City Council, and interveners collectively as "respondents."

6

In February 2023, petitioners moved for judgment on their pleading. The City and City Council filed a joint opposition, and interveners separately opposed the motion as well.

The court issued a detailed written ruling after hearing argument. The court denied petitioners' claims that Measure H constituted an impermissible revision of the Charter and violated the state and federal Constitutions with regard to Rental Board membership. The court ruled in petitioners' favor on their preemption claim to the extent section 1806(a)(9) and (10) of Measure H required greater notice before the termination of a tenancy than the notice required under Civil Code section 1946.1 and Government Code section 7060.4. The court severed language from the Measure H provisions and rejected petitioners' other arguments on the preemption claim.

The court entered a judgment and issued a peremptory writ of mandate as to the granted portion of the petition. Petitioners timely appealed from the judgment.

## DISCUSSION

The parties agree that no facts are in dispute and that petitioners' appeal presents only questions of law, which we review independently.[3] (See *Move Eden Housing v. City of*

___

[3] We grant interveners' unopposed request to take judicial notice of nine exhibits that were properly noticed by the superior court. (Evid. Code, § 459, subd. (a).) Interveners also request we take judicial notice of an exhibit produced after the underlying judgment was entered that contains excerpts from the "Recommended Fiscal Year 2025 (FY 2025) Budget for the City of Pasadena" presented by the City Manager to the City Council.

*Livermore* (2024) 100 Cal.App.5th 263, 272-273 [legal issues reviewed independently on appeal from denial of petition for writ of mandate]; accord, *City of Oakland v. Oakland Police & Fire Retirement System* (2014) 224 Cal.App.4th 210, 226.)

A.      *Measure H Did Not Impermissibly Revise the Charter*

Petitioners argue Measure H constituted an impermissible "revision," as opposed to a permissible "amendment," to the Charter, in violation of article XI, section 3, subdivision (b) of the California Constitution.  Respondents contend Measure H amended, but did not revise, the Charter, and thus did not run afoul of the Constitution.  We review de novo these questions requiring interpretation of the Constitution and Measure H.  (See *City of San Jose v. Howard Jarvis Taxpayers Assn.* (2024) 101 Cal.App.5th 777, 794; *Los Angeles Waterkeeper v. State Water Resources Control Bd.* (2023) 92 Cal.App.5th 230, 264.)  Our task is to give effect to the constitutional provisions governing changes to local government charters as well as the intended purpose of Measure H.  (See *California Cannabis Coalition v. City of Upland* (2017) 3 Cal.5th 924, 933 (*California Cannabis Coalition*); *Citizens for Planning Responsibly v. County of San Luis Obispo* (2009) 176 Cal.App.4th 357, 366.)

In construing constitutional provisions, we start with the text in its relevant context and ascribe to words their ordinary meaning, considering related provisions and the structure of the relevant constitutional scheme.  (*California Cannabis Coalition*,

---

We deny this separate request because these excerpts are unnecessary to resolve the issues on appeal.  (*Sweeney v. California Regional Water Quality Control Bd.* (2021) 61 Cal.App.5th 1093, 1118, fn. 3.)

*supra*, 3 Cal.5th at pp. 933-934.)  Likewise, in reviewing initiative measures, "[w]e first examine the language of the initiative as the best indicator of the voters' intent.  [Citation.]  We give the words of the initiative their ordinary and usual meaning and construe them in the context of the entire scheme of law of which the initiative is a part, so that the whole may be harmonized and given effect."  (*Schmeer v. County of Los Angeles* (2013) 213 Cal.App.4th 1310, 1316.)  " ' "[W]e do not consider or weigh the economic or social wisdom or general propriety of the initiative, but rather evaluate its constitutionality in the context of established constitutional standards." ' [Citation.]  The ' "initiative power must be liberally construed to promote the democratic process." ' " (*Jensen v. Franchise Tax Bd.* (2009) 178 Cal.App.4th 426, 432-433; accord, *California Cannabis Coalition*, at p. 934; *Rossi v. Brown* (1995) 9 Cal.4th 688, 695.) "An initiative measure ' "must be upheld unless [its] unconstitutionality clearly, positively, and unmistakably appears." ' " (*The Park at Cross Creek, LLC v. City of Malibu* (2017) 12 Cal.App.5th 1196, 1203.)

       1.    *The Constitution's amendment and revision provisions*

The California Constitution addresses matters of local government under article XI.  Section 3, subdivision (a) authorizes a county or city to adopt, for purpose of its governance, "a charter by majority vote of its electors voting on the question." (Cal. Const., art. XI, § 3, subd. (a).)  An adopted charter "may be *amended, revised*, or repealed in the same manner." (*Ibid.*, italics added.)  While none of these terms is defined, section 3, subdivision (b) provides:  "The governing body or charter commission of a county or city may propose a charter or *revision*.

9

*Amendment* or repeal may be proposed by initiative or by the governing body." (*Id.*, § 3, subd. (b), italics added.)

Thus, the Constitution specifies that the initiative power may be used to propose amendments but not revisions to county or city charters. This distinction in the plain language of subdivision (b) of article XI, section 3 is reinforced by subdivision (c), which provides: "An election to determine whether to draft or *revise* a charter and elect a charter commission may be required by initiative or by the governing body." (*Id.*, § 3, subd. (c), italics added.) In other words, although there is no initiative power to propose a charter revision, the electorate may compel an election to determine whether to revise the charter through a charter commission or the governing body.

The Constitution sets forth the same amendment-revision dichotomy for changes to the Constitution as well. Section 1 of article XVIII provides that the Legislature, with two-thirds of each house concurring, may "propose an *amendment* or *revision* of the Constitution," and section 2 provides the Legislature may "submit at a general election the question whether to call a convention to *revise* the Constitution." (Cal. Const., art. XVIII, §§ 1-2, italics added.) Thus, the Legislature must initiate any proposed revision to the Constitution being placed on the ballot. (See *Legislature of the State of California v. Weber* (2024) 16 Cal.5th 237, 255-256 (*Weber*); *Strauss v. Horton* (2009) 46 Cal.4th 364, 414 (*Strauss*), abrogated on another ground in *Obergefell v. Hodges* (2015) 576 U.S. 644, 685.) In contrast, section 3 of article XVIII provides that "[t]he electors may *amend* the Constitution by initiative." (Cal. Const., art. XVIII, § 3, italics added.) And section 4 provides that any "proposed *amendment* or *revision* shall be submitted to the electors," with,

10

as a general matter, any approved amendment or revision taking effect five days after the results are certified.  (*Id.*, § 4, italics added.)  Article II, which addresses voting and the initiative, referendum, and recall powers, defines "initiative" as "the power of the electors to propose statutes and *amendments* to the Constitution and to adopt or reject them."  (*Id.*, art. II, § 8, subd. (a), italics added.)

Thus, the Constitution may be amended but not revised by initiative.  (See *Strauss*, *supra*, 46 Cal.4th at p. 386 ["although the initiative process may be used to propose and adopt *amendments* to the California Constitution, under its governing provisions that process may not be used to *revise* the state Constitution"]; accord, *Weber*, *supra*, 16 Cal.5th at pp. 254-255; *Legislature v. Eu* (1991) 54 Cal.3d 492, 506 (*Eu*); *Raven v. Deukmejian* (1990) 52 Cal.3d 336, 349-350 (*Raven*); *Amador Valley Joint Union High Sch. Dist. v. State Bd. of Equalization* (1978) 22 Cal.3d 208, 221; *McFadden v. Jordan* (1948) 32 Cal.2d 330, 332-334 (*McFadden*).)  The higher bar for constitutional revisions as opposed to amendments "is based on the principle that 'comprehensive changes' to the Constitution require more formality, discussion and deliberation than is available through the initiative process."  (*Eu*, at p. 506.)

Just as the Constitution does not define the terms "amendment" or "revision" under article XI with respect to local government charters, it does not define them in article XVIII or article II as they apply to proposed changes to the provisions of the Constitution.  But we conclude the terms have the same meaning in both contexts.  The provisions under article XI, section 3 regarding changes to local government charters were adopted in 1970 amidst "a general constitutional revision and

11

streamlining." (*Clark v. Patterson* (1977) 68 Cal.App.3d 329, 335, fn. 6.)  By that point, the Supreme Court had already distinguished between the terms "amendment" and "revision" in the context of changes to the Constitution.  (See *McFadden*, *supra*, 32 Cal.2d at pp. 331-334; *Livermore v. Waite* (1894) 102 Cal. 113, 117-119.)  "When a term has been given a particular meaning by a judicial decision, it should be presumed to have the same meaning in later-enacted statutes or constitutional provisions."  (*Richmond v. Shasta Community Services Dist.* (2004) 32 Cal.4th 409, 422-423.)  Moreover, because article XI distinguishes charter amendments and revisions in the same manner that constitutional amendments and revisions are distinguished under articles II and XVIII, we conclude the amendment-revision framework that courts have developed to assess whether a proposed change to the Constitution is an amendment or a revision may fairly be applied to determine if a local initiative such a Measure H constitutes a permissible amendment or an impermissible revision to a municipal charter.[4]

---

[4]     We reject interveners' contention that the amendment-revision framework applicable to changes to the Constitution does not apply to changes to local government charters because the constitutional language pertaining to changes to the Constitution is meaningfully distinct from the language regarding changes to charters.  Relying on the fact that article XI, section 3, subdivision (b) describes an initiative power to propose a "repeal" of a charter, interveners contend that this separate initiative power must allow for revisions by initiative because repealing a charter in its entirety is "certainly a more fundamental change that a mere 'revision.' "  This reading disregards the clear distinction under subdivision (b) between the

2.     *The amendment-revision framework*

To determine whether a change is an amendment or a revision, "a court carefully must assess (1) the meaning and scope of the . . . change at issue, and (2) the effect—both quantitative and qualitative—that the . . . change will have on the *basic governmental plan or framework* embodied in the preexisting provisions of the [charter]." (*Strauss*, *supra*, 46 Cal.4th at p. 387; accord, *Raven*, *supra*, 52 Cal.3d at p. 350.) " '[A]n enactment which is so extensive in its provisions as to change directly the "substantial entirety" of the [charter] by the deletion or alteration of numerous existing provisions may well constitute a revision thereof. However, even a relatively simple enactment may accomplish such far reaching changes in the nature of our basic

initiative power to propose a charter repeal and the separate power of a governing body or charter commission to propose charter revisions. Before the streamlining of article XI in 1970, there was no prescribed power to propose a charter revision, but the electorate could compel an election to determine whether a *county* charter should be repealed. (See Cal. Const., art. XI, former § 7.5.) In creating section 3, subdivision (b), the Constitution Revision Commission explained that "[t]he existing provision for proposing repeal of county charters by elector petition is revised to permit repeal to be proposed by governing bodies or by initiative and this right is extended to cities." (Cal. Const. Revision Com., Proposed Revision (1968) p. 54.) The Commission explained that, in addition to these changes, "[a]uthorization is added [under subdivision (b)] permitting charter commissions and governing bodies to propose charter 'revision.' " (*Ibid.*) Thus, not only is the interveners' interpretation of subdivision (b) contrary to the plain language of the provision, it is belied by drafting history showing the Commission intended the powers to propose a repeal and propose a revision to be distinct.

13

governmental plan as to amount to a revision also.' " (*Weber*, *supra*, 16 Cal.5th at p. 258; see also *California Assn. of Retail Tobacconists v. State of California* (2023) 109 Cal.App.4th 792, 834 ["Whether an initiative constitutes an amendment or revision to the Constitution does not necessarily depend on the number of constitutional provisions it affects, but on the nature of the changes it makes."].)

For a measure to constitute a revision, " 'it must *necessarily or inevitably appear from the face* of the challenged provision that the measure will substantially alter the basic governmental framework' " set forth in the charter. (*Weber*, *supra*, 16 Cal.5th at p. 254; see *Strauss*, *supra*, 46 Cal.4th at p. 439; *Eu*, *supra*, 54 Cal.3d at p. 510.) "For example, 'an enactment which purported to vest all judicial power in the Legislature would amount to a revision without regard either to the length or complexity of the measure or the number of existing articles or sections affected by such change.' " (*Weber*, at p. 259.)

When evaluating whether an initiative constitutes an amendment or revision, the challenged measure must be examined in its entirety. (*Weber*, *supra*, 16 Cal.5th at p. 260.) "While a single provision of an initiative may constitute a revision standing alone (see *Raven*, *supra*, 52 Cal.3d at pp. 340-341), a proposed initiative may also be a revision based on its combined effects. (*McFadden*, *supra*, 32 Cal.2d at pp. 345-346.) Viewed in isolation, one provision may not be so impactful as to change the ' "nature *of our basic governmental plan*" ' (*Strauss*, *supra*, 46 Cal.4th at p. 441), yet it is possible that the collective impact of multiple provisions may accomplish such a change." (*Weber*, at p. 260.)

14

### 3. *Quantitative effect*

The quantitative analysis in the amendment-revision inquiry has become "less significant" since the Constitution's single-subject rule was adopted in 1948. (*Weber, supra,* 16 Cal.5th at p. 259; see Cal. Const., art. II, § 8, subd. (d) ["An initiative measure embracing more than one subject may not be submitted to the electors or have any effect."]; see also *Shea Homes Limited Partnership v. County of Alameda* (2003) 110 Cal.App.4th 1246, 1255 [single-subject rule applies as limitation to statewide and local initiatives].) Before that rule's adoption, the Supreme Court determined a proposed initiative in *McFadden* was an impermissible revision because its effect "would be to substantially alter the purpose and to attain objectives clearly beyond the lines of the Constitution as now cast" rather than working " 'within the lines of the original instrument' " to achieve " 'an improvement or better carry out the purpose for which it was framed.' " (*McFadden, supra,* 32 Cal.2d at p. 350.) The initiative in *McFadden* proposed to add 21,000 words to a then-55,000-word Constitution and dealt with a "wide and diverse range of subject matters," including retirement pensions, gambling, taxes, healing arts, civic centers, surface mining, fishing, city budgets, liquor control, senate reapportionment, and oleomargarine. (*Id.* at pp. 334-345.) The court determined the initiative would repeal or substantially alter "at least 15 of the 25 articles" contained in the Constitution at the time, introduce at least four new topics to the Constitution, and "substantially curtail[]" the legislative and judicial functions of the state government. (*Id.* at p. 345.) The court emphasized that the "far reaching" initiative was also "multifarious" in its construction in that it denied the electorate "an opportunity to

15

express approval or disapproval severally as to each major change suggested." (*Id.* at pp. 332, 346.)

Petitioners assert that Measure H's changes are even "more quantitatively substantial" than those in *McFadden*. They point out that Measure H almost doubled the Charter's length by adding over 18,000 words in 24 new sections to a document that had previously contained approximately 24,000 words and 166 sections. They contend this near-doubling of the word count in the Charter "is indicative of far-reaching changes to the existing structure of Pasadena's government," and assert that Pasadena voters previously "adopted a comparatively straight-forward governmental framework, centralizing all administrative and executive power in the hands of the [City] Council, Mayor and City Manager."

As an initial matter, Measure H is limited to the single subject of housing. While its treatment of that subject may be more comprehensive in comparison to other subjects in the Charter, petitioners offer no principled reason to conclude that past brevity in the drafting of Charter language is a barrier to later efforts by the electorate to be more thorough or detailed in its exercise of the initiative power. Moreover, Measure H added to the Charter and did not purport to delete or alter preexisting provisions. Measure H instead provides that it is not meant to "revise, repeal, or supersede" any provisions beyond its scope of enabling the Rental Board to exercise its authority and fulfill its specified responsibilities. (§ 1821.) This stands in marked contrast to *McFadden*, where the Supreme Court referenced the number of words added by the proposed initiative within its greater analysis describing the "wide and diverse range of subject matters proposed to be voted upon" and the significant effects the

16

initiative would have in terms of expressly repealing or altering existing constitutional provisions. (*McFadden*, *supra*, 32 Cal.2d at pp. 334-346.)

Nonetheless, petitioners argue that, even without explicit repeals or alterations, Measure H "substantially, if indirectly, affects and qualifies a host of existing charter provisions." They particularly focus on provisions granting certain powers to the City Council and City Manager. But contrary to petitioners' contentions—and as discussed in more detail in the following section—none of these provisions precludes creation of an independent rental housing board. For example, the Charter grants "[a]ll powers of the City" to the City Council but states that that grant of power shall be "subject to the provisions of this Charter," thus recognizing the absolute scope of the City Council's authority may be limited elsewhere in the Charter. (§ 409.) Likewise, the Charter states that specific administrative and executive powers "are delegated to and vested in" the City Manager, but it does not state that these powers must be exclusively held by the City Manager, nor does it state that other such powers may not exist and be held by other entities within the local government. (§ 604.)

In sum, as a quantitative matter, Measure H's changes were "not 'so extensive . . . as to change directly the "substantial entirety" of the Constitution by the deletion or alteration of numerous existing provisions.' " (*Strauss*, *supra*, 46 Cal.4th at p. 431.)

4. *Qualitative effect*

Petitioners also argue Measure H imposed substantial qualitative changes on the City Charter. Petitioners contend Measure H revised the City's basic plan of government by

17

(1) usurping essential legislative and executive functions from the City Council, Mayor, and City Manager; (2) interfering with the City Council's exclusive budget and fiscal planning authority; (3) authorizing greater compensation for Rental Board members than other City officials; and (4) altering the essential powers of recall and removal.[5]

      a.     Legislative and executive functions

The Charter establishes a "council-manager" form of government in which the City's legislative powers are vested in the Mayor and seven City Council members, and the City's executive and administrative powers are vested in the Mayor and City Manager.  (§§ 401, 406, 409, 601, 604.)  Petitioners contend that Measure H substantially alters this structure because it authorizes the Rental Board to operate independently from the City Council, Mayor, and City Manager, and vests "that unelected Board with exclusive powers over one of the most fundamental policy issues in California—housing costs—which would otherwise be the exclusive purview of the City Council exercising its legislative powers and the City Manager exercising the City's executive function."  In reviewing the Charter, however, we do not find the dramatic power grabs that petitioners describe.

---

[5]     The Santa Monica Rent Control Board, City of Santa Monica, and City of Berkeley Rent Stabilization Board submitted an amicus brief in support of the City, arguing that independent rental boards created through voter initiatives had not significantly changed governance in their respective cities.  While this suggests Measure H is not unique in its scope and aims, neither of these other initiatives appears to have been challenged as an impermissible charter revision under article XI of the Constitution.

18

First, Measure H does not usurp legislative powers from the City Council or the Mayor. The Charter states that "[a]ll powers of the City shall be vested in the City Council subject to the provisions of this Charter and to the Constitution of the State of California." (§ 409.) The City Council is empowered to appoint and remove the City Manager, City Attorney, City Prosecutor, and City Clerk (§ 410) and obligated to "provide for the organization of all city operations and activities" through the creation and abolishment of "city departments, offices and agencies, advisory boards, commissions and committees," and modification of their respective "functions, powers, and duties" (§ 411). The Mayor "shall be a voting member of the City Council and shall preside at meetings of the City Council." (§ 406.)

Without disturbing any of these provisions, Measure H empowers the Rental Board to "[e]stablish rules and regulations for the administration and enforcement of" its provisions. (§ 1811(e)(2), (f).) This delegation of rule-making power to the Rental Board is not unique. Similar delegations are found throughout the City's municipal code. For instance, the City Manager is authorized to "establish such rules and regulations relating to the conduct of departments under his direction and control as he deems necessary." (Pasadena Mun. Code, § 2.40.050; see also, e.g., *id.*, § 2.250.090(N) [retirement board "shall have the power to make all rules and regulations necessary for the administration of the retirement system not inconsistent with the provisions of the Charter and this chapter"]; *id.*, § 4.04.070 [finance director "shall promulgate rules and regulations for the implementation of" chapter pertaining to City's disposition of salvage and scrap property]; *id.*, § 4.56.155 [tax administrator "may adopt administrative rules and

19

regulations not inconsistent with provisions of this chapter for the purpose of carrying out and enforcing the payment, collection and remittance of the [utility use] taxes herein imposed"].)

Like with these other delegations, the Rental Board is granted authority to establish rules and regulations for a specific purpose—in this instance, implementing Measure H's rent control and just cause eviction provisions. This relatively narrow carve-out of rule-making authority for the Rental Board is consistent with the City Council's broad but not unlimited grant of "[a]ll powers of the City . . . *subject to the provisions of this Charter*." (§ 409, italics added.) Moreover, Measure H expressly recognizes the City Council may continue to legislate on matters related to its provisions so long as the legislation does not create a conflict. (§ 1820(a) ["Nothing in this subsection shall be construed to restrict the authority of the City Council to enact complimentary or non-conflicting ordinances or take other such actions within its powers, where such ordinances or actions are designed to comply with or further the terms and purposes of this Article."].)

Measure H also does not usurp executive and administrative powers from the Mayor or the City Manager. The Charter provides that, in addition to having "a voice and vote in all proceedings of the City Council," the Mayor shall serve as the City's chief executive and perform any duties prescribed by the Charter or imposed by the City Council. (§ 406.) It also provides that the City Manager "shall be the chief administrative officer and head of the administrative branch of city government," and vests in the City Manager numerous administrative and executive functions, powers, and duties. (§§ 601, 604.)

20

Notwithstanding these delegations of administrative and executive authority, the Charter does not state that the powers of the Mayor and City Manager are to be exclusively held or that specific exercises of those powers cannot be further delegated. The Charter already exempts "officers appointed by the City Council" from the City Manager's powers to "appoint, promote, discipline and terminate the employment of all officers and employees of the City." (§ 604(C).) It similarly exempts "the City Attorney, City Prosecutor, and City Clerk, and their respective staffs" from the City Manager's powers to "exercise supervision and control over all departments, divisions, and offices of the City." (§ 604(D).) Further, the Charter allows the City Council to review and vote to overrule or modify any action, determination, or omission of the City Manager. (§ 604(J).) And as with the grant of rule-making authority, any administrative and executive powers held by the Rental Board are confined to the specific and narrow scope of Measure H's rent control and just cause eviction provisions. (§ 1811(e).) The Mayor and City Manager retain their respective authority for all other municipal functions.

We are not persuaded by petitioners' comparison of the Rental Board to the "pension commission" that would have been created by the initiative in *McFadden*. The *McFadden* court explained this new five-member commission would be delegated far-reaching and largely unchecked powers that would place it "substantially beyond the system of checks and balances which heretofore has characterized our governmental plan." (*McFadden, supra*, 32 Cal.2d at p. 348.) The commission would have exclusive authority to amend the initiative's provisions, with which every conflicting "sentence and clause of our Constitution" would be repealed. (*Ibid*.) Courts would also be

21

prohibited from interfering with the new provisions or decisions of the commission, absent voter approval.  (*Id*. at pp. 348-349.)  Unlike the provisions granting exclusive authority to the pension commission in *McFadden*, Measure H's provisions may be superseded by any initiative amendment to the Charter that receives a greater number of affirmative votes than Measure H.  (§ 1820(b)(3).)  In further contrast, Measure H authorizes landlords and tenants to seek judicial review of the Rental Board's actions and decisions (§ 1815) and acknowledges that its provisions may be declared or rendered invalid or unenforceable by courts and state and federal legislatures (§ 1811(o)).

Petitioners cite section 1811(m) of Measure H, which states that the Rental Board "shall exercise its powers and duties under this Article independent from the City Council, City Manager, and City Attorney."  Petitioners also point out that Measure H authorizes the Rental Board to establish its own budget, set fees to support its budget and penalties for violations of its rules, hire and fire its own staff and consultants, file or intervene in court actions, and retain its own legal counsel.  (§ 1811(e), (*l*), (n).)  But these provisions do not show a fundamental alteration of the City's government as the provisions in *McFadden* did.  As discussed, Measure H authorizes the Rental Board to promulgate rules and regulations for the administration and enforcement of Measure H's provisions, and it grants the Rental Board specific powers and duties in the discrete areas of rent control, just cause evictions, and landlord-tenant relations.  For all other matters, the City Council, Mayor, and City Manager retain their vast legislative, executive, and administrative authority.

Since *McFadden*, the Supreme Court has deemed only two challenged initiative measures to be impermissible constitutional

revisions. (See *Weber, supra*, 16 Cal.5th 237; *Raven, supra*, 52 Cal.3d 336.) In *Raven*, the court considered a provision of the initiative measure known as the "Crime Victims Justice Reform Act," which stated, in part, that numerous fundamental rights of criminal defendants "shall be construed by the courts of this state in a manner consistent with the Constitution of the United States" and that the California Constitution "shall not be construed by the courts to afford greater rights to criminal defendants than those afforded by the Constitution of the United States." (*Raven*, at p. 350.) The court explained the provision was qualitatively devastating to the preexisting constitutional scheme because its practical effect was to "vest all judicial *interpretive* power, as to fundamental criminal defense rights, in the United States Supreme Court." (*Id.* at p. 352.) The provision "unduly restrict[ed] judicial power" by leaving the state courts with no authority "to interpret the state Constitution in a manner more protective of defendants' rights than extended by the federal Constitution, as construed by the United States Supreme Court." (*Id.* at pp. 352-353.) This "severely limit[ed] the independent force and effect of the California Constitution" and directly contradicted "the well-established jurisprudential principle that, 'The judiciary, from the very nature of its powers and means given it by the Constitution, must possess the right to construe the Constitution in the last resort . . . .' " (*Id.* at pp. 353-354.)

In *Weber*, the court considered a proposed initiative that would require all revenue-raising measures at the state and local levels to secure voter approval before enactment. (*Weber, supra*, 16 Cal.5th at pp. 249-251, 277.) The court concluded the initiative would "fundamentally restructure the most basic of

23

governmental powers" by removing the Legislature's long-settled exclusive and indispensable authority to levy taxes and promptly raise revenues when necessary to respond to state and local emergencies. (*Id.* at pp. 263-266, 277.) The court also noted the initiative would further alter the preexisting framework of state and local governments by removing their ability to delegate fee-setting authority to executive or administrative officers. (*Id.* at pp. 268-277.)

The measures in *Raven* and *Weber* each involved a significant usurpation of governmental powers and duties and disruption of the preexisting government framework that does not exist in the challenged Measure H provisions.

b. Budget and fiscal planning authority

Measure H provides that the Rental Board shall have the power and duty to "[e]stablish a budget for the reasonable and necessary implementation of the provisions of this Article, including but not limited to the hiring of necessary staff, such as Hearing Officers, and the maintenance of a Rental Registry." (§ 1811(e)(10).) To finance its operations pursuant to that budget, the Rental Board has authority to charge landlords "an annual Rental Housing Fee . . . , in amounts deemed reasonable by the Rental Board in accordance with applicable law." (§ 1811(e)(10), (*l*)(1).) Further, until the Rental Board has collected fees sufficient to support its operations, "the City shall advance all necessary funds to ensure the effective implementation of" Measure H. (§ 1811(*l*)(2).) Measure H provides that "[t]he City may seek reimbursement of any advanced funds from the Rental Board after the Rental Housing Fee has been collected." (*Ibid.*)

Citing these provisions, petitioners assert that Measure H intrudes on the budget authority of the City Council, Mayor, and City Manager and, in doing so, "sets up an independent, competing center of fiscal power" in the City government. The relevant Charter provisions do not establish such an intrusion or conflict.

The Charter provides the City Manager with the power and duty "[t]o prepare and submit to the City Council the annual budget." (§ 604(H).) It further describes the preparation and adoption of the City's annual budget as follows: By the end of February, the Mayor presents a thematic budget message for the upcoming fiscal year to the City Council. (§ 902.) Public suggestions and comments on the Mayor's budget proposals are then received and considered before City departments prepare and submit budget estimates to the City Manager. (*Ibid.*) Next, the City Manager submits to the City Council a preliminary budget of the City's probable expenditures and revenues for the succeeding fiscal year. (*Ibid.*) The City Council then holds a public hearing after publishing notice of the proposed budget and the hearing. (§ 903.) Finally, the City Council considers the proposal and makes any advisable revisions before adopting a budget by the end of June. (§ 904.)

Petitioners fail to demonstrate how the Rental Board's standalone authority to establish its own budget and finance its own operations through rental housing fees imposed on landlords in any way affects the budget process for the rest of the City's operations. Instead, the Rental Board's budget powers and duties are entirely separate from those of the City Council, Mayor, and City Manager. Petitioners make the point that, before the Rental Board's creation, all powers related to the City's

budget were "conferred exclusively" on the City Council, Mayor, and City Manager. Even so, the Charter does not mandate that this authority must remain exclusive. To the contrary, and as discussed, the Charter allows for such authority to be limited and shared with or delegated to other local government entities. (§§ 409, 604.)

Nor is an upending of the City's fiscal management apparent from the obligation for the City to advance necessary start-up funds to the Rental Board, particularly with complementary permission for the City to pursue reimbursement from the Rental Board of any funds advanced. Petitioners contend that although the City "*may* seek reimbursement of any advanced funds," nothing under Measure H obligates the Rental Board to comply with such a request. (§ 1811(*l*)(2), italics added.) Maybe so. But the Rental Board's estimated requirement of $5 to $6 million for start-up funds would constitute only 0.54 percent of the City's total operating budget for the fiscal year 2023 (albeit 2 percent of the budget's unrestricted general fund). Even if the Rental Board failed to reimburse the City for those advanced funds, it does not "necessarily or inevitably appear from the face of" Measure H that this one-time cost "will substantially alter the [City's] basic governmental framework." (*Eu*, *supra*, 54 Cal.3d at p. 510.)

            c.      Rental Board member compensation

Measure H provides that "[e]ach member of the Rental Board shall be compensated on an hourly basis for their time committed to Rental Board meetings. The chairperson of the Board will record the length of each meeting, and all Board Members in attendance will be compensated accordingly. Board Members will be compensated for a maximum of twenty (20)

hours per week.  The hourly rate of compensation shall be equal to 2.5 times the Pasadena minimum wage."  (§ 1811(j).)

Petitioners offer calculations showing that this formula authorizes maximum annual compensation that could be greater than the maximum permitted for City Council members and the Mayor.  Petitioners assert this demonstrates the Rental Board "is established as branch [*sic*] of government co-equal to the [City] Council and Mayor," which, petitioners contend, is "a significant change to the prior system in which the [City] Council and Mayor held ultimate authority for all governance in the City" and "another significant departure from the previously subsidiary role that commissions have traditionally played in Pasadena governance."

Respondents contend petitioners' compensation comparison is inherently speculative because it assumes Rental Board members will work for 20 hours per week and 52 weeks per year, neither of which is required under Measure H.  (See *Eu, supra,* 54 Cal.3d at p. 509 [conjectural and speculative consequences do not assist in demonstrating substantial alteration of governmental scheme].)  Regardless, the Constitution grants plenary authority for a city charter to set forth the terms of compensation for municipal officers and employees.  (Cal. Const., art. XI, § 5, subd. (b).)  The electorate exercised that authority in providing those terms for Rental Board members through the adoption of Measure H.  Even if Rental Board members are ultimately compensated in greater amounts than the Mayor or City Council members, it does not follow that such a pay discrepancy alone would necessarily unmoor the City's traditional governance.

### d. Recall and removal authority

Measure H provides that "No vote of the electorate will be required to remove a Board member." (§ 1811(d).)[6] Instead, Rental Board members may be removed pursuant to petitions signed by a certain percentage of qualified voters. (*Ibid.* [either 5 or 10 percent based on type of Rental Board position].) The City Council is responsible for establishing a process for removal petitions and is authorized to remove Rental Board members "upon petition by the Rental Board for repeated or significant violations of the Rental Board's Code of Conduct." (*Ibid.*)

Petitioners argue this provision is incongruous with the City Council's preexisting recall and removal powers, including its ability to remove members of other appointed commissions at will. They contend that Measure H instead "creates a massive exception to the generally-applicable structure of government for the [Rental] Board, making its members answerable not to duly elected officials (as is usually the case) or even to the broader electorate, but to a minute fraction of the City's residents."

Section 410 of the Charter, which states that the City Council "shall appoint and may remove the City Manager, City Attorney, City Prosecutor, and City Clerk," was not modified or repealed by Measure H. Nor were any changes made to section 411, which describes the City Council's authority over the functions, powers, and duties of City departments, offices, agencies, boards, commissions, and committees, or section 1301,

---

[6] Upon its original enactment, section 1811(d) of Measure H provided that "No vote of the electorate will be required to *recall* a Board member." (Italics added.) This provision was amended after this case commenced. (See Pasadena Resolution No. 10103, amending § 1811(d).)

which reserves for the electorate the power to recall elected City officers. Even if the procedure for removing members of the Rental Board under Measure H is different from the recall and removal procedures in these other provisions, petitioners have not shown how that distinction fundamentally alters the City's governmental framework in any meaningful way.

5.      *Conclusion*

While the changes to the Charter embodied in Measure H may be significant, "the amendment process never has been reserved only for minor or unimportant changes." (*Strauss*, *supra*, 46 Cal.4th at p. 446.) Ultimately, we must resolve all doubts in favor of the initiative process. (*Eu*, *supra*, 54 Cal.3d at pp. 501, 512.) Doing so here, we conclude that Measure H does not, on its face, necessarily or inevitably constitute an impermissible revision of the Charter. Because Measure H's changes instead constituted a permissible Charter amendment, its enactment by initiative did not violate article XI, section 3, subdivision (b) of the California Constitution.

B.      *Measure H Did Not Impose an Unconstitutional Property Qualification or Violate the Equal Protection Clause*

At the heart of Measure H is its creation of an appointed Rental Board with significant independent authority, including to set allowable rent increases and annual adjustments, create and maintain a registry of rental units subject to rent control, establish regulations for the administration and enforcement of the rent control, just cause eviction, and other provisions of Measure H, establish penalties for violations of these provisions, and hear appeals on rent adjustment petitions. (§§ 1811-1813.) Petitioners contend Measure H's provision on the composition of

29

the Rental Board (§ 1811(a)) violates the prohibition against property qualifications under article I, section 22 of the California Constitution and the equal protection clause of the Fourteenth Amendment to the federal Constitution. (See *Domar Electric, Inc. v. City of Los Angeles* (1994) 9 Cal.4th 161, 170 ["the charter represents the supreme law of the City, subject only to conflicting provisions in the federal and state constitutions and to preemptive state law"].)

1. *Rental Board composition*

Measure H provides that the Rental Board shall be comprised of 11 members appointed by the City Council. (§ 1811(a).) Seven of the positions must be filled by "Tenants" with no "Material Interest in Rental Property"; the City Council must appoint one Tenant member from each of the City's seven districts. (§ 1811(a).) A Tenant is a "tenant, subtenant, lessee, sublessee or any other person entitled under the terms of a Rental Housing Agreement or this Article to the use or occupancy of any Rental Unit." (§ 1803(aa).) Individuals have a Material Interest in Rental Property if within the last three years "they, or any member of their Extended Family, [have] own[ed], manage[d], or [had] a 5 percent or greater ownership stake in Rental Units in the county of Los Angeles." (§ 1803(i).) The other four Rental Board positions are considered "at-large" and may be filled by any Pasadena resident regardless of which district he or she lives in, whether he or she is a Tenant, or whether he or she has a Material Interest in Rental Property. (§ 1811(a).)

Actions of the Rental Board require six affirmative votes, and a quorum to take any action requires six members present,

four of whom must be Tenants.  (§ 1811(h)-(i).)  There is no requirement that any at-large members be present for a quorum.

2.     *Property qualification challenge under the state Constitution*

Article I, section 22 of the California Constitution provides: "The right to vote or hold office may not be conditioned by a property qualification."  Added to the Constitution in 1879 as article I, section 24, the provision originally read:  "No property qualification shall ever be required for any person to vote or hold office."  (See Cal. Const., art. I, former § 24.)

This provision forbids conditioning the rights to vote and hold public office on the ownership of property.  (See *City of San Diego v. Shapiro* (2014) 228 Cal.App.4th 756, 780, fn. 23 ["The California Constitution expressly forbids conditioning the right to vote on the ownership of property."]; see also *Barber v. Galloway* (1924) 195 Cal. 1, 11-12; *Tarpey v. McClure* (1923) 190 Cal. 593, 606; *People ex rel. Chapman v. Sacramento Drainage Dist.* (1909) 155 Cal. 373, 376, 389; *Bjornestad v. Hulse* (1991) 229 Cal.App.3d 1568, 1596-1597.)  Petitioners argue the word "property" in the term "property qualification" should be read broadly to encompass any conceivable property interest, including a leasehold.  (See *Callahan v. Martin* (1935) 3 Cal.2d 110, 118 [leasehold constitutes a personal property interest].)  Thus, because Measure H restricts eligibility for the seven tenant positions on the Rental Board to persons holding a leasehold, Petitioners contend, it violates the constitutional prohibition on conditioning the right to hold office on a property qualification.  Respondents counter that "property" should be read more

31

narrowly to mean only real property ownership, which would necessarily foreclose petitioners' theory.[7]

Petitioners' argument regarding the word "property" in the term "property qualification" presents an issue of first impression that requires interpretation of the California Constitution, a matter we consider de novo. (*Thurston v. Midvale Corp.* (2019) 39 Cal.App.5th 634, 639; *City of San Diego v. Shapiro, supra,* 228 Cal.App.4th at p. 771.) " 'In interpreting a constitution's provisions, our paramount task is to ascertain the intent of those who enacted it. [Citation.] To determine that intent, we "look first to the language of the constitutional text, giving the words their ordinary meaning." [Citation.] If the language is clear, there is no need for construction. [Citation.] If the language is

---

[7] The parties also dispute whether each Rental Board position is a separate "office" for purposes of article I, section 22, with petitioners arguing certain individuals are barred from occupying seven separate offices on the Rental Board and respondents contending every City resident may serve on the Rental Board, which constitutes a single, indivisible office notwithstanding the different membership conditions for its 11 positions. We need not resolve this particular dispute because even presuming petitioners are correct that the positions are separate offices, we conclude the constitutional provision is not violated here.

Given that conclusion, we also need not address respondents' suggestion that the Rental Board is a limited-purpose board or commission to which article I, section 22 does not apply. (See *Greene v. Marin County Flood Control & Water Conservation Dist.* (2010) 49 Cal.4th 277, 297, fn. 8 [property qualification provision does not apply to "fee and assessment elections conducted by limited purpose government agencies that disproportionately affect certain property owners"].)

ambiguous, however, we consider extrinsic evidence of the enacting body's intent.' " (*Professional Engineers in California Government v. Kempton* (2007) 40 Cal.4th 1016, 1037.)  "When a provision of the Constitution is ambiguous, a court ordinarily must adopt the interpretation which carries out the intent and objective of the drafters of the provision and of the people by whose vote it was enacted."  (*Wiseman Park, LLC v. Southern Glazer's Wine & Spirits, LLC* (2017) 16 Cal.App.5th 110, 117; accord, *Recorder v. Comm'n on Judicial Performance* (1999) 72 Cal.App.4th 258, 269.)  The court may also consider " 'the impact of an interpretation on public policy, for "[w]here uncertainty exists consideration should be given to the consequences that will flow from a particular interpretation." ' " (*Wiseman Park, LLC*, at p. 118, quoting *Mejia v. Reed* (2003) 31 Cal.4th 657, 663.)

By not defining the word "property" or modifying it with adjectives such as "real" or "personal," the Constitution leaves room for multiple interpretations in light of the word's various ordinary and legal meanings.  Notwithstanding this inherent ambiguity, drafting history of the constitutional language demonstrates the property qualification provision was intended to prohibit barring persons from voting or holding office because they did not own real property.  (See *Arcadia Unified School Dist. v. State Dept. of Education* (1992) 2 Cal.4th 251, 260 ["The first step in interpreting an ambiguous constitutional provision is to look at the intent of the framers."].)

The property qualification provision was debated during the 1878-1879 Constitutional Convention before it was adopted. (See *Mosk v. Superior Court* (1979) 25 Cal.3d 474, 495 ["To ascertain the intent and objective of an ambiguous constitutional

33

provision, a court may consider . . . the record of the debates."];
*Story v. Richardson* (1921) 186 Cal. 162, 165 [to aid in
interpreting ambiguous terms in the Constitution, courts may
consider "the debates in a constitutional convention"].)
Petitioners point out that a proponent of the provision remarked
that "[p]roperty qualifications of *any and every kind* are not in
consonance with the spirit of the American State."  (1 Willis &
Stockton, Debates & Proceedings, Cal. Const. Convention 1878-
1879 (Willis & Stockton), p. 269 [remarks of delegate J. Richard
Freud], italics added.)  While petitioners argue this statement
establishes the word "property" should be read broadly to include
each and every kind of property interest, the rest of the delegate's
remarks reveal a specific focus on qualifications based on real
property ownership.  For instance, the delegate later stated:
"[T]he American nation is eminently a nation of *landholders* and
*property owners.  This provision, then, is essentially a protection
and encouragement to the small *landless* minority."  (3 Willis &
Stockton, at p. 1192 [remarks of delegate J. Richard Freud],
italics added; see also 1 Willis & Stockton, at p. 269 [remarks of
delegate J. Richard Freud] ["When we come to look into the
question there is in reality no laboring man who is not a property
owner—no laboring man who is not a taxpayer.  Capital is
nothing but accumulated labor, and he who assists in the
accumulation is no less a capitalist than a laborer.  *The man who
drives my wagon is honest, and honorable, and intelligent, but
while he has no property he certainly helps me to pay the taxes
upon mine.  His name as well as mine should appear upon the
assessment roll.*"], italics added; *id.* [remarks of delegate Henry
Edgerton] [stating, in response to remarks of delegate Freud, "A
man has a right to seek an office.  He has a right to vote.

Certainly that right should not be dependent upon the amount of property he owns."].)

The framers' focus on real property ownership for purposes of the property qualification provision is also evidenced by a subsequent convention debate regarding a proposed amendment to a separate provision permitting the adoption of a city charter prepared by an elected "Board of fifteen freeholders." (3 Willis & Stockton, *supra*, at p. 1406.)[8] An opponent of this "freeholder requirement" asked whether it was invalid under the newly adopted property qualification provision and proposed that board membership should instead be qualified on "five years residence in the city." (*Id.* at p. 1406 [remarks of delegate C.J. Beerstecher].) The delegate added, "If the electors choose to send a man to perform this work who does not own real estate, I think they should have a right to do it." (*Ibid.*) A proponent of the freeholder requirement responded that it was "not in conflict with other portions of the Constitution, because it is all one instrument and must be taken together. That is, no property qualification shall ever be allowed except as provided in the instrument itself." (*Id.* at p. 1406 [remarks of delegate Jno. S. Hager].) The delegates ultimately voted to keep the word "freeholders" in the provision. (*Id.* at p. 1406; see also Cal. Const., art. XI, former § 8 [freeholder requirement in adopted provision of 1879 Constitution].) Collectively, this historical evidence demonstrates the framers understood and intended for the property qualification provision to serve as protection for the

_____

[8] A "freeholder" is someone who owns an estate in land that is of indeterminate duration. (See Civ. Code, § 765; *Pacific Southwest Realty Co. v. County of Los Angeles* (1991) 1 Cal.4th 155, 162-163.)

rights of Californians who did not own land by making it unlawful to require real property ownership as a qualification for voting or holding office.

Public policy considerations also support the interpretation that the property qualification provision is limited to real property ownership. Under petitioners' interpretation, numerous other boards and commissions existing under state law would seemingly be unconstitutional based on their reservation of certain positions for particular licensees, whose licenses constitute property interests. (See *Zuckerman v. State Board of Chiropractic Examiners* (2002) 29 Cal.4th 32, 43 ["the holder of a professional license 'has a property interest in the right to practice his profession' "].) For instance, Business and Professions Code section 2007 states that a majority of appointed members to the Medical Board of California must be licensed as a physician or surgeon, and at least some of those members must also hold a faculty appointment at a California medical school. (See also, e.g., Bus. & Prof. Code, § 5000, subd. (a) [seven of 15 members of the California Board of Accountancy must be licensed as certified public accountants]; *id.*, § 5514 [half of appointed members of the California Architects Board must be licensed architects]; *id.*, §§ 6013.1, subd. (a), 6013.3, subd. (a) [majority of the board of trustees of the State Bar must be licensed attorneys].) The existence and presumed validity of numerous apparatuses across our state government is a compelling reason to not adopt petitioners' novel and unsupported constitutional interpretation. (See *Reuter v. Board of Supervisors of San Mateo County* (1934) 220 Cal. 314, 321 [a cardinal rule of constitutional interpretation is to avoid, if possible, constructions "which would

36

lead to absurd results"]; accord, *Equinix LLC v. County of Los Angeles* (2024) 101 Cal.App.5th 1108, 1116-1117.)

We thus construe the bar on property qualifications under article I, section 22 to mean the rights to vote and hold office may not be conditioned on the ownership of a real property interest. Measure H does not violate the constitutional provision because none of the Rental Board positions is restricted to individuals who own real property.

Petitioners alternatively argue that even if the property qualification provision only pertains to real property ownership, individuals (i.e., landlords) may not be barred from holding office because they own real property just as individuals may not be barred because they do not own real property. Petitioners provide no authority suggesting the constitutional provision supports an inverse property qualification theory or, as respondents frame it, a "property *dis*qualification" theory. Moreover, even if this theory were sound, it would not apply here because no one is disqualified from any position on the Rental Board based on his or her property ownership. All Pasadena residents can apply for the four at-large positions regardless of whether they own property. And the seven tenant positions require only that an applicant (1) is a Tenant and (2) does not possess a Material Interest in Rental Property. An individual can meet both of those qualifications while still owning real property. (See § 1803(i), (aa).) In other words, any property disqualification under Measure H is based not on ownership of real property, but rather on the property's use as rental property. (Cf. *Apartment Assn. of Los Angeles County, Inc. v. City of Los Angeles* (2001) 24 Cal.4th 830, 838 [distinguishing property ownership from its use as rental property for purposes of

determining whether municipal inspection fees were an unconstitutional levy "upon a person as an incident of property ownership"].)

In sum, the Rental Board's composition under Measure H does not violate the prohibition on property qualifications under article I, section 22 of the California Constitution.

3. *Equal protection challenge under federal Constitution*

Petitioners also contend that reserving seven of the Rental Board positions for Tenants without a Material Interest in Rental Property violates the equal protection clause of the Fourteenth Amendment to the United States Constitution.[9]  They note that while Pasadena residents who are not Tenants or who have a Material Interest in Rental Property can apply for the four remaining seats, they are not guaranteed any of them.  They assert Measure H "depriv[es] landlords . . . of the right to be considered on equal terms for each of the seats on the Board, instead conferring a guaranteed supermajority with preferential voting rights on tenants and placing severe restrictions on the rights of property-owners to serve."  They suggest the restrictions discriminate against them based on their "economic status" and "the policy views they are expected to espouse on the Board."

a. Applicable law

The Fourteenth Amendment provides that no state may "deny to any person within its jurisdiction the equal protection of the laws."  (U.S. Const., 14th Amend.)  "This provision is 'essentially a direction that all persons similarly situated should

---

[9]      Before the superior court, Petitioners also argued their claim under the equal protection clause in article I, section 7 of the California Constitution.  Petitioners do not make an argument under the state Constitution on appeal.

38

be treated alike.' [Citation.] 'At core, the requirement of equal protection ensures that the government does not treat a group of people unequally without some justification.' " (*People v. Hardin* (2024) 15 Cal.5th 834, 847 (*Hardin*); accord, *Getzels v. State Bar of California* (2025) 112 Cal.App.5th 388, 398 (*Getzels*).)

"Traditionally, California courts engaged in a two-part inquiry to determine if there has been an equal protection violation. [Citation.] The threshold question was whether a classification affected two or more groups ' "similarly situated in all material respects" ' in an unequal manner. [Citation.] In *Hardin*, the California Supreme Court held that courts no longer needed to ask this threshold question when the challenged classification appears on the face of the law." (*Getzels*, *supra*, 112 Cal.App.5th at p. 398; see *Hardin*, *supra*, 15 Cal.5th at p. 850 ["when plaintiffs challenge laws drawing distinctions between identifiable groups or classes of persons, on the basis that the distinctions drawn are inconsistent with equal protection, courts no longer need to ask at the threshold whether the two groups are similarly situated for purposes of the law in question"]; accord, *Cole v. Superior Court* (2024) 104 Cal.App.5th 1280, 1289 ["in *Hardin*, our high court . . . eliminate[d] the first step of the [equal protection] analysis . . . when the classification appears on the face of the law"].) The only inquiry necessary in such a case is " 'whether the challenged difference in treatment is adequately justified under the applicable standard of review.' " (*Getzels*, at p. 398, quoting *Hardin*, at pp. 850-851; accord, *Cole*, at p. 1289.)

In allocating seven of the Rental Board positions exclusively to Tenants without a Material Interest in Rental Property, Measure H distinguishes between persons who meet these criteria and other residents of Pasadena who do not.

39

Because this distinction appears on the face of Measure H, we need not address the parties' arguments about whether the groups are similarly situated. Rather, we focus our inquiry on whether the differential treatment of Pasadena residents who are not Tenants without a Material Interest in Rental Property is "adequately justified under the applicable standard of review." (*Cole v. Superior Court*, *supra*, 104 Cal.App.5th at p. 1289.) "Where, as here, the facts are undisputed, we review independently whether the classifications offend equal protection." (*Ibid.*)

        b.      Rational basis review applies

Petitioners argue that Measure H's discrimination against landlords and property owners for purposes of Rental Board membership is subject to the strict scrutiny standard of review. Respondents contend rational basis review applies. Respondents are correct.

"The degree of justification required to satisfy equal protection depends on the type of unequal treatment at issue. [Citation.] Courts apply strict scrutiny when a challenged statute or regulation involves a suspect class, such as one based upon race, or a fundamental right, such as the right to vote. [Citation.] ' " 'Under the strict standard applied in such cases, the *state* bears the burden of establishing not only that it has a compelling interest which justifies the law but that the distinctions drawn by the law are *necessary* to further its purpose.' " ' " (*Getzels*, *supra*, 112 Cal.App.5th at p. 399; accord, *Warden v. State Bar* (1999) 21 Cal.4th 628, 641 (*Warden*).)

" 'But when a statute involves neither a suspect classification nor a fundamental right, the "general rule is that legislation is presumed to be valid and will be sustained if the

40

classification drawn by the statute is rationally related to a legitimate state interest." ' [Citation.] This standard—rational basis review—' "is the basic and conventional standard for reviewing economic and social welfare legislation in which there is a 'discrimination' or differentiation of treatment between classes or individuals." ' " (*Getzels*, *supra*, 112 Cal.App.5th at p. 399; accord, *Gerawan Farming, Inc. v. Agricultural Labor Relations Bd.* (2017) 3 Cal.5th 1118, 1140; *Warden*, *supra*, 21 Cal.4th at p. 641.) "A court applying this standard finds 'a denial of equal protection only if there is no *rational* relationship between a disparity in treatment and some legitimate government purpose.' " (*Hardin*, *supra*, 15 Cal.5th at p. 847; accord, *Johnson v. Department of Justice* (2015) 60 Cal.4th 871, 881 (*Johnson*); *Getzels*, at p. 399.)

Petitioners do not describe themselves as members of a suspect class or identify a fundamental right that is at stake. Nor do petitioners even rely on equal protection cases in making their argument that heightened scrutiny applies. Instead, petitioners point to cases applying the balancing test developed by the Supreme Court in *Anderson v. Celebrezze* (1983) 460 U.S. 780 and *Burdick v. Takushi* (1992) 504 U.S. 428 to consider whether a state election law impermissibly burdens voting rights under the First Amendment and the due process clause of the Fourteenth Amendment. (See *Anderson*, at p. 787, fn. 7 ["we base our conclusions directly on the First and Fourteenth Amendments and do not engage in a separate Equal Protection Clause analysis"].) Under that test, when the plaintiff is subject to "severe" burdens on his or her voting rights because of state action, heightened scrutiny applies such that the state law "must be 'narrowly drawn to advance a state interest of compelling

41

importance.' " (*Burdick*, at p. 434.) While petitioners seek application of this level of scrutiny here, this case does not involve election laws or burdens on constitutionally protected voting rights. To the contrary, the entire Rental Board is to be appointed by the City Council. Moreover, petitioners did not allege in their petition—nor have they ever since contended, including on appeal—that the challenged Measure H provision violates their First Amendment or Fourteenth Amendment due process rights under the *Anderson-Burdick* test. We decline to now develop that argument for them.[10]

---

[10] Petitioners correctly note that the Sixth Circuit has applied the *Anderson-Burdick* test to challenges under the First Amendment and the Equal Protection Clause in *Daunt v. Benson* (6th Cir. 2021) 999 F.3d 299, 303, 310, 314, involving eligibility criteria for the state redistricting commission, and *Obama for Am. v. Husted* (6th Cir. 2012) 697 F.3d 423, 430, which held that "when a state regulation is found to treat voters differently in a way that burdens the fundamental right to vote, the *Anderson-Burdick* standard applies." However, in another decision, the Sixth Circuit recognized "it takes some legal gymnastics" to apply the *Anderson-Burdick* test to equal protection claims and that the court applied the test only because it was bound by *Obama for Am.* (*Mays v. LaRose* (6th Cir. 2020) 951 F.3d 775, 783, fn. 4.) The court in *Mays* acknowledged that "[t]he traditional Equal Protection tiers of scrutiny" are "better suited" than the *Anderson-Burdick* test "for analyzing disparate treatment claims—even in the voting context." (*Ibid.*)

Petitioners also rely on *American Motors Sales Corp. v. New Motor Vehicle Board* (1977) 69 Cal.App.3d 983 for the proposition that "administrative board structures with mandated memberships that are insufficiently counterbalanced with respect to the interests subject to board control are unconstitutional,

As stated, rational basis review applies when the challenged law does not implicate a fundamental right or suspect class. (*Johnson*, *supra*, 60 Cal.4th at p. 881.) The right to hold public office is not a fundamental right under the equal protection clause of the Fourteenth Amendment. (*Rittenband v. Cory* (1984) 159 Cal.App.3d 410, 420-421; accord, *Claussen v. Pence* (7th Cir. 2016) 826 F.3d 381, 387 ["the right to assume office is not a fundamental right"].) Nor is the right to be a candidate for public office. (*Boyer v. County of Ventura* (2019) 33 Cal.App.5th 49, 57; *Kern County Employees' Retirement Assn. v. Bellino* (2005) 126 Cal.App.4th 781, 794; accord, *Bullock v. Carter* (1972) 405 U.S. 134, 143; *Biener v. Calio* (3d Cir. 2004) 361 F.3d 206, 214 ["The right to run for office has not been deemed a fundamental right."].) Further, "landlords are not a suspect class." (*Schnuck v. City of Santa Monica* (9th Cir. 1991) 935 F.2d 171, 176.) Neither are wealthy individuals, to the extent petitioners suggest landlords are being treated differently based on their "economic status" and property ownership. (See *Jensen v. Franchise Tax Bd.*, *supra*, 178 Cal.App.4th at pp. 434-435 ["We are unaware of any case authority holding that wealthy individuals form a 'suspect class deserving of a heightened degree of scrutiny.' "]; *NAACP v. Jones* (9th Cir. 1997) 131 F.3d 1317, 1322 ["[w]ealth is not a suspect category in Equal Protection

since such tribunals are 'constituted as to slant [their] judicial attitude in favor of one class of litigants over another.' " But that case did not concern a facial equal protection challenge and only addressed claims under the due process clauses in the state and federal Constitutions. (*Id.* at p. 985.) Petitioners have not cited any case holding an equal protection violation arose from imbalanced board membership. And as discussed, petitioners did not plead a due process violation in this case.

jurisprudence"].)  And petitioners provide no authority demonstrating a class comprising anyone who may not hold one of the seven tenant positions—that is, any Pasadena resident who is not a Tenant or is in possession of a Material Interest in Rental Property—is a suspect one.  Accordingly, we examine whether there is any " ' "rational relationship between the disparity of treatment and some legitimate governmental purpose." ' " (*Johnson*, at p. 881.)

>            c.      The Rental Board composition survives rational
>                    basis review

"To mount a successful rational basis challenge, a party must ' "negative every conceivable basis" ' that might support the disputed statutory disparity.  [Citation.]  If a plausible basis exists for the disparity, courts may not second-guess its ' "wisdom, fairness, or logic." ' " (*Johnson, supra*, 60 Cal.4th at p. 881; accord, *Hardin, supra*, 15 Cal.5th at p. 864.)  The burden is on the challenger to show the absence of a rational relationship between the disparity in treatment and some legitimate government purpose. (*Warden, supra*, 21 Cal.4th at p. 641; accord, *Hardin*, at p. 851.)

In adopting the provision regarding the Rental Board's composition, the voters of Pasadena had a rational basis to treat Tenants without a Material Interest in Rental Property differently from those who do not fit both specifications.  In enacting Measure H, the voters found that tenants occupied a significant majority (57.7 percent) of housing in Pasadena and faced greater risks and consequences of housing instability, homelessness, and unregulated evictions.  (§ 1802(a), (e)-(j), (o), (p).)  Reserving seven of 11 seats (or 63.6 percent) of the Rental Board for Tenants without a Material Interest in Rental Property

ensures tenants have representation on the Rental Board roughly commensurate with their share of the population of Pasadena. It also has the effect of limiting the number of landlords who can serve on the Rental Board. The voters additionally found that the City Council had stymied prior efforts to introduce rent control and just cause eviction measures—notwithstanding their substantial popular support—and that landlords historically had been overrepresented on the City Council. (§ 1802(bb), (cc), (ee), (ff).) These findings further support a rational conclusion that it was necessary for the Rental Board to feature a proportionate share of tenants to ensure landlords' interests were not overrepresented in the Rental Board's operations.[11]

Petitioners do not address, much less negate, these plausible bases in their opening brief. Instead, petitioners argue that the "only purportedly rational basis" is "a desire to hamstring landlords' ability to advance their interests through the political processes of the City, and that is invidious discrimination." To support that argument, petitioners attempt

---

[11] The California Supreme Court has held that generally "[t]he fact that the initiative process results in legislation reflecting the will of the majority and imposing certain burdens upon landlords can hardly be deemed a ground for holding the legislat[ion] invalid. It is of the essence of the police power to impose reasonable regulations upon private property rights to serve the larger public good." (*Birkenfeld v. City of Berkeley* (1976) 17 Cal.3d 129, 145-146.) As discussed, the specific question whether creating an intentionally unbalanced board favoring tenants and disfavoring landlords is consistent with the guarantees of due process under the United States Constitution is not before us.

to compare this case to *Turner v. Fouche* (1970) 396 U.S. 346 (*Turner*) and *Quinn v. Millsap* (1989) 491 U.S. 95 (*Quinn*).

In each case, the United States Supreme Court determined a property ownership requirement for membership on a local board violated the equal protection clause of the Fourteenth Amendment because it was not rationally related to any legitimate state interest. *Turner* concerned a Georgia law limiting membership on county school boards to "freeholders," which meant any person owning real property. (396 U.S. at p. 348 & fn. 1.) In defense of the freeholder requirement, the state advanced only one argument: that nothing specified "any minimum quantity or value for the real property the freeholder must own," so "anyone who seriously aspire[d] to county school-board membership 'would be able to obtain a conveyance of the single square inch of land he would require to become a "freeholder." ' " (*Id.* at p. 363.) The Court explained that, if the state was taken at its word, it was "difficult to conceive of any rational state interest underlying [the freeholder] requirement." (*Ibid.*) The Court then noted that, even without the state's admission as to the insubstantiality of its interest, it was "impossible to discern any interest the [property] qualification can serve." (*Ibid.*)

In *Quinn*, the Court considered a provision of the Missouri Constitution stating that "the governments of the city of St. Louis and St. Louis County may be reorganized by a vote of the electorate of the city and county upon a plan of reorganization drafted by a 'board of freeholders.' " (491 U.S. at p. 96 & fn. 1.) Ownership of real property was considered a prerequisite to serve on this board of freeholders. (*Id.* at pp. 97-98.) The Court held "it is a form of invidious discrimination to require land ownership of

46

all appointees to a body authorized to propose reorganization of local government" and further rejected as illegitimate the asserted rationale that property ownership ensured knowledge of community issues and long-term community attachment. (*Id.* at pp. 106-108.) The property ownership requirement thus did not pass the rational basis test. (*Id.* at pp. 108-109.)

*Turner* and *Quinn* are inapt comparisons for the circumstances here. As discussed, none of the Rental Board positions is subject to a property ownership requirement. Moreover, neither *Turner* nor *Quinn* considered whether eligibility requirements based on tenancy status or rental property interest could pass constitutional muster. Nor did either consider plausible justifications for differential treatment of board candidates like those proffered for Measure H. Further, in *Turner* and *Quinn*, the property ownership requirement applied to every board position. Thus, neither case considered the constitutional significance of conditioning some but not all board positions on a particular eligibility requirement such as that at issue here. For these myriad reasons, petitioners' comparisons to *Turner* and *Quinn* are misplaced and do not support their equal protection claim.

In sum, the Pasadena voters had a rational basis to distinguish Tenants without a Material Interest in Rental Property from all others for purposes of the Rental Board's composition.

### d. Disclosure requirement

As a standalone part of their equal protection claim, petitioners argue that Measure H "burdens would-be landlord members' ability to serve by forcing them to comprehensively disclose" any rental property interest in Los Angeles County held

47

by themselves and their extended families. Measure H states that, to apply to become a Rental Board member, applicants must provide a verified statement under penalty of perjury "of the interests and dealings of the applicant and their Extended Family in Rental Properties in the county of Los Angeles during the three (3) years immediately prior to the submission of the application." (§ 1811(b); see also § 1803(g) [defining "Extended Family" as "any spouse, whether by marriage or not, domestic partner, parent, child, sibling, grandparent, aunt or uncle, niece or nephew, grandchild, or cousin"].) Petitioners' argument does not support their equal protection claim because the disclosure requirement under section 1811(b) applies equally to "[a]ll prospective members of the Rental Board." (See *People v. Nolasco* (2021) 67 Cal.App.5th 209, 220 [if two groups " 'are not being treated differently, then there can be no equal protection violation' "].)[12]

---

[12]    In making this argument, petitioners rely on *City of Carmel-by-the-Sea v. Young* (1970) 2 Cal.3d 259, which was not an equal protection case but rather one based on the right to privacy. (See *id.* at pp. 266-268 [grounding right to privacy in the Fourth Amendment and the "penumbra of constitutional rights" not specifically mentioned in the federal Constitution].) Because petitioners did not allege a separate cause of action for violation of a right to privacy, we need not further consider whether the disclosure requirement under section 1811(b) infringes on that constitutional protection. (See Cal. Const., art. I, § 1 [inalienable right to pursue privacy].)

C. *Preemption of Measure H's Relocation Assistance and Notice Provisions*

Petitioners contend two Measure H provisions are preempted by state law. First, they assert section 1806(b)(C), which requires landlords to pay relocation assistance to tenants who are displaced by a lawful rent increase, is preempted by the Costa-Hawkins Rental Housing Act (Costa-Hawkins Act), Civil Code section 1954.50 et seq. Second, with respect to landlords who wish to initiate the eviction process for nonpayment of rent, petitioners contend sections 1803(cc) and 1806(a)(1) impose an additional notice requirement that conflicts with the unlawful detainer scheme under Code of Civil Procedure section 1161.

Whether state law preempts a municipal ordinance is a question of law that we consider de novo. (*Chevron U.S.A. Inc. v. County of Monterey* (2023) 15 Cal.5th 135, 143 (*Chevron*); *Coyne v. City and County of San Francisco* (2017) 9 Cal.App.5th 1215, 1224 (*Coyne*).)

1. *Preemption principles*

Article XI, section 7 of the California Constitution provides that a "city may make and enforce within its limits all local, police, sanitary, and other ordinances and regulations not in conflict with general laws." But " ' "[i]f otherwise valid local legislation conflicts with state law, it is preempted by such law and is void." ' "[13] (*Chevron, supra*, 15 Cal.5th at p. 142.) A

_____

[13] Under article XI, section 5, subdivision (a) of the California Constitution, a charter city such as Pasadena is exempt from the "conflict with general laws" restrictions under section 7 " '*with respect to its municipal affairs*.' " (*Sherwin-Williams Co. v. City of Los Angeles* (1993) 4 Cal.4th 893, 897, fn. 1; accord, *City of*

49

conflict may arise " ' "if the local legislation ' "duplicates, contradicts, or enters an area fully occupied by general law, either expressly or by legislative implication." ' " ' " (*Ibid.*)  Here, petitioners claim a conflict exists based on implied preemption of a fully occupied field (i.e., field preemption) and contradiction.  "The party alleging preemption 'has the burden of demonstrating' it."  (*Id.* at pp. 142-143.)

Field preemption applies when the Legislature has expressly or impliedly manifested its intent to fully occupy the area.  (*Chevron, supra,* 15 Cal.5th at p. 142.)  " '[L]ocal regulation is invalid if it attempts to impose additional requirements in a field which is fully occupied by statute.' "  (*American Financial Services Assn. v. City of Oakland* (2005) 34 Cal.4th 1239, 1252.)  " '[A]bsent a clear indication of preemptive intent from the Legislature,' we presume that local regulation 'in an area over which [the local government] traditionally has exercised control' is not preempted by state law."  (*Action Apartment Assn., Inc. v. City of Santa Monica* (2007) 41 Cal.4th 1232, 1242 (*Action Apartment*.*)

Implied field preemption "occurs when: (1) general law so completely covers the subject as to clearly indicate the matter is exclusively one of state concern; (2) general law partially covers

---

*Rancho Palos Verdes v. State of California* (2025) 114 Cal.App.5th 13, 23-24 [discussing this "limited" exemption known as "the 'home rule' or municipal affairs doctrine" and the three-part framework for determining whether it applies].)  Just as "rent control is not a municipal affair as to which a charter provision would prevail over general state law" (*Birkenfeld v. City of Berkeley, supra,* 17 Cal.3d at p. 141), Measure H's relocation assistance and notice requirements do not constitute "municipal affairs."  The parties do not contend otherwise.

the subject in terms clearly indicating a paramount state concern that will not tolerate further local action; or (3) general law partially covers the subject and the adverse effect of a local ordinance on transient citizens of the state outweighs the possible municipal benefit." (*Big Creek Lumber Co. v County of Santa Cruz* (2006) 38 Cal.4th 1139, 1157-1158; accord, *Chevron, supra,* 15 Cal.5th at p. 142; see, e.g., *Birkenfeld v. City of Berkeley* (1976) 17 Cal.3d 129, 149, 152 (*Birkenfeld*) [local regulation requiring landlords to obtain certificates of eviction before seeking repossession of rent-controlled units could not stand because state law fully occupied the field of landlord's possessory remedies]; *Apartment Assn. of Los Angeles County, Inc. v. City of Los Angeles* (2006) 136 Cal.App.4th 119, 132 [Legislature intended state law to fully occupy the field regarding the period of time a tenant's rent payment is frozen following termination of a Section 8 agreement; thus, a municipal ordinance purporting to confer greater protections upon the tenant was preempted].)

Local legislation is "contradictory" when it is inimical to general state law. (*City of Riverside v. Inland Empire Patients Health & Wellness Center, Inc.* (2013) 56 Cal.4th 729, 743.) "The 'contradictory and inimical' form of preemption does not apply unless the ordinance directly requires what the state statute forbids or prohibits what the state enactment demands." (*Ibid.*) "Thus, no inimical conflict will be found where it is reasonably possible to comply with both the state and local laws." (*Ibid.*; accord*, San Francisco Apartment Assn. v. City & County of San Francisco* (2024) 104 Cal.App.5th 1218, 1227 (*SFAA IV*).) However, " '[w]hen a statute or statutory scheme seeks to promote a certain activity and, at the same time, permits more stringent local regulation of that activity, local regulation cannot

be used to . . . frustrate the statute's purpose.' " (*Chevron U.S.A., Inc. v. County of Monterey* (2021) 70 Cal.App.5th 153, 172; accord, *Great Western Shows, Inc. v. County of Los Angeles* (2002) 27 Cal.4th 853, 868; *City of Riverside*, at p. 760; see, e.g., *International Brotherhood of Electoral Workers v. City of Gridley* (1983) 34 Cal.3d 191, 202 [" 'Although the Legislature did not intend to preempt all aspects of labor relations in the public sector [in enacting the Meyers-Milias-Brown Act], we cannot attribute to it an intention to permit local entities to adopt regulations which would frustrate the declared policies and purposes of [that legislation].' "]; *AIDS Healthcare Foundation v. Bonta* (2024) 101 Cal.App.5th 73, 88 (*AIDS Healthcare Foundation*) [state law preempted local regulations where state law "seeks to promote higher density housing projects and allows for 'more stringent local regulation' of housing projects, but local housing density caps are being used to 'frustrate the statute's purpose' "].)

"[A] state statute preempts local laws adopted through initiative only if there is a ' "clear showing" ' or 'definite indication' of legislative intent to do so." (*AIDS Healthcare Foundation, supra*, 101 Cal.App.5th at p. 89; accord, *City of Morgan Hill v. Bushey* (2018) 5 Cal.5th 1068, 1079.)

> 2. *The relocation assistance requirement under section 1806(b)(C) is preempted by the Costa-Hawkins Act*

Petitioners argue Measure H's relocation assistance requirement for tenants displaced by a lawful rent increase, section 1806(b)(C), is preempted by the Costa-Hawkins Act.[14]

---

[14] Section 1806(b) also requires payment of relocation assistance to tenants displaced by no-fault evictions for necessary

52

Section 1806(b)(C) states in relevant part that a "Landlord shall provide Relocation Assistance to any Tenant household who is displaced from a Rental Unit due to inability to pay Rent increases in excess of 5 percent plus the most recently announced Annual General Adjustment in any twelve-month period."[15] Measure H does not specify how it will be determined, or who decides, that a tenant has an "inability to pay" the increased rent, nor does Measure H prescribe particular amounts of applicable relocation assistance. Measure H instead empowers the Rental Board to issue rules and regulations establishing procedures for determining such amounts and for an appeals process regarding relocation assistance. (*Ibid.*) It also provides that "the Board may reduce the threshold triggering Relocation Assistance to Rent increases lower than 5 percent plus the most recently announced Annual General Adjustment in any twelve-month

---

and substantial repairs, owner move-in, withdrawal of the unit from the residential rental market (Ellis Act), and compliance with a government order. (See § 1806(a)(8)-(11).) These additional relocation assistance requirements are not at issue here.

[15] Section 1806(b)(C)'s relocation assistance requirement applies only to rental units that are not covered by Measure H's rent control provisions. For units that are covered by those provisions, Measure H prohibits annual rent increases beyond the Annual General Adjustment. (§§ 1807, 1808.)

The Annual General Adjustment is "the percentage by which the Rent for existing tenancies in Covered Rental Units may be increased each year" under Measure H. (§§ 1803(b), 1808(a).) It is calculated as 75 percent of the percentage increase in the Consumer Price Index published by the United States Department of Labor's Bureau of Labor Statistics. (§ 1808(a)(1).)

period if it determines that the lower threshold is necessary to further the purposes of" Measure H. (*Ibid.*)

        a.      The Costa-Hawkins Act

The Costa-Hawkins Act was enacted in 1995 "to relieve landlords from some of the burdens of 'strict' and 'extreme' rent control, which the proponents of [the] Costa-Hawkins [Act] contended unduly and unfairly interfered with the free market." (*Apartment Assn. of Los Angeles County, Inc. v. City of Los Angeles* (2009) 173 Cal.App.4th 13, 30 (*Apartment Assn. of Los Angeles County*), italics omitted; accord, *NCR Properties, LLC v. City of Berkeley* (2023) 89 Cal.App.5th 39, 47 (*NCR Properties*).) As pertinent here, Civil Code section 1954.52 exempts from local rent control laws certain residential property—including single-family homes and rental units that have certificates of occupancy issued after February 1, 1995—thus permitting landlords to "adjust the rent on such property at will." (*DeZerega v. Meggs* (2000) 83 Cal.App.4th 28, 40-41; see Civ. Code, § 1954.52, subd. (a) ["Notwithstanding any other provision of law, an owner of residential real property may establish the initial and all subsequent rental rates for a dwelling or a unit" in certain circumstances]; *Apartment Assn. of Los Angeles County,* at p. 24 ["Civil Code section 1954.52, subdivision (a)(1), effectively exempts newly constructed rental units from local rent control"].)[16]

---

[16]     However, effective April 1, 2024 (until it sunsets on January 1, 2030), the Tenant Protection Act of 2019 (Assem. Bill No. 1482, 2019-2020 Reg. Sess.) provides that for certain rental units that were issued a certificate of occupancy more than 15 years ago, landlords may not, over any 12-month period,

54

In addition, for certain properties still covered by local rent control laws, another provision of the Costa-Hawkins Act, Civil Code section 1954.53, instituted a system of "vacancy decontrol," which generally permits landlords "to set the rent on a vacant unit at whatever price they choose." (*NCR Properties*, *supra*, 89 Cal.App.5th at p. 47; see Civ. Code, § 1954.53; *Action Apartment*, *supra*, 41 Cal.4th at p. 1237; *Apartment Assn. of Los Angeles County*, *supra*, 173 Cal.App.4th at p. 24 [Civil Code section 1954.53 "established 'vacancy decontrol for residential dwelling units where the former tenant has voluntarily vacated, abandoned or been legally evicted' "].)

Petitioners' challenge is based on the landlords' right under Civil Code section 1954.52 to adjust at will the rent on rental units that the Costa-Hawkins Act exempts from local rent control laws (exempt units).

      b.      Field preemption does not apply

Petitioners first contend that Measure H's relocation assistance requirement under section 1806(b)(C) is invalid because it is subject to field preemption under the Costa-Hawkins Act. They contend the Costa-Hawkins Act "is a comprehensive

---

increase rent more than 5 percent plus the percentage change in the cost of living, or 10 percent, whichever is lower. (Civ. Code, § 1947.12(a)(1), (d)(4), (n), (o).)

The Tenant Protection Act also provides for relocation assistance equivalent to one month's rent, regardless of the tenant's income level, in the event of a "no-fault just cause" eviction. (Civ. Code, § 1946.2, subd. (d).) It does not, however, provide for relocation assistance in the event a tenant is unable to pay the monthly rent following a lawful rent increase. (See *id.*, § 1946.2, subd. (b)(2) [listing no-fault just cause bases for eviction].)

treatment of [the] field of the setting of residential rental rates, indicating the Legislature's intent to fully occupy the field."  To support this proposition, they rely on legislative history indicating the Act was intended to "establish statewide guidelines for any local regulation of rental rates for residential accommodations.  It would pre-empt more restrictive controls." (See Sen. Com. on Judiciary, Analysis of Sen. Bill No. 1257 (1995-1996 Reg. Sess.) as introduced Apr. 4, 1995, p. 3.)  However, this legislative history does not amount to a clear statement of intent to fully occupy the broad field of rent control such that no "*additional* requirements" connected to rent control may be imposed.  (See *American Financial Services Assn. v. City of Oakland, supra,* 34 Cal.4th at p. 1252, italics added.)  Rather, it merely provides that more "restrictive" controls will be preempted, i.e., measures that *contradict* the provisions of the Costa-Hawkins Act.  (See Sen. Com. on Judiciary, Analysis of Sen. Bill No. 1257, *supra,* p. 3.)

The text of the Costa-Hawkins Act contains no express statement of intent to fully occupy the broad field of rent control. Nor has the Legislature impliedly manifested such intent. (*Chevron, supra,* 15 Cal.5th at p. 142.)  Rather, in the more recent Tenant Protection Act of 2019 (Assem. Bill No. 1482, 2019-2020 Reg. Sess.), the Legislature explicitly acknowledged local governments' authority to establish rent regulations that are "otherwise consistent" with the Costa-Hawkins Act.  (Civ. Code, § 1947.12, subd. (m)(2).)  Likewise, in *Action Apartment, supra,* 41 Cal.4th at page 1245, which postdated the enactment of the Costa-Hawkins Act, the California Supreme Court reaffirmed that, so long as local measures or regulations do not conflict with state law, "municipal governments [have] the authority to enact

56

and enforce particular local laws governing landlord-tenant relations, including those related to evictions and *rent control*." (Italics added; accord, *NCR Properties*, *supra*, 89 Cal.App.5th at p. 56 ["Local governments may make and enforce rent control 'ordinances and regulations not in conflict with' state law."].) Field preemption thus does not apply to the relocation assistance requirement.

### c. The relocation assistant requirement contradicts the Costa-Hawkins Act

The closer question is whether the requirement under section 1806(b)(C) that landlords pay relocation assistance to tenants who are unable to pay increased rent—that the Costa-Hawkins Act authorizes landlords to charge—contradicts the Act and is thus preempted.

The superior court found there was no such contradiction. The court explained that section 1806(b)(C) does not restrict the ability of a landlord to increase the rent for an exempt unit to the maximum allowed under state law. The court acknowledged that "[i]f tenants leave because they are unable to pay that amount, section 1806(b)(C) may result in the rent increase becoming less lucrative, in some cases, due to the payment of relocation assistance." Because the Rental Board had not yet set the amount of the relocation assistance payments, however, the court concluded it could not assess on a purely facial challenge petitioners' contention that relocation assistance could "cancel out or substantially reduce any rent increase."

We disagree with the superior court's determination that petitioners' argument may not be assessed in a facial challenge as well as the court's conclusion that there is no conflict between

57

section 1806(b)(C) and the Costa-Hawkins Act provision allowing landlords to raise rents on exempt units at will.

"Ruling on a facial challenge to a local ordinance, the court considers the text of the measure itself, not its application to any particular circumstances or individual." (*T-Mobile West LLC v. City and County of San Francisco* (2019) 6 Cal.5th 1107, 1117; accord, *San Francisco Apartment Assn. v. City and County of San Francisco* (2016) 3 Cal.App.5th 463, 487; see *Travis v. County of Santa Cruz* (2004) 33 Cal.4th 757, 767 [facial challenge to an ordinance is " 'predicated on a theory that the mere enactment of the . . . ordinance worked a [constitutional violation]"].) "[A]lthough we may not invalidate a statute simply because in some future hypothetical situation constitutional problems may arise [citation], neither may we . . . uphold the law simply because in some hypothetical situation it might lead to a permissible result." (*California Teachers Assn. v. State of California* (1999) 20 Cal.4th 327, 347.) In assessing a facial challenge, " ' "[t]he proper focus of constitutional inquiry is the group for whom the law is a restriction, not the group for whom the law is irrelevant." ' " (*Tom v. City and County of San Francisco* (2004) 120 Cal.App.4th 674, 680.)[17]

---

[17] "There is some uncertainty regarding the standard for facial constitutional challenges to statutes and local ordinances. [Citation.] Some cases have held that legislation is invalid if it conflicts in the generality or great majority of cases. [Citation.] Others have articulated a stricter standard, holding that legislation is invalid only if it presents a total and fatal conflict with applicable constitutional prohibitions." (*T-Mobile West LLC v. City and County of San Francisco, supra*, 6 Cal.5th at p. 1117, fn. 6; accord, *In re T.F.-G.* (2023) 94 Cal.App.5th 893, 909.)

In *Coyne, supra*, 9 Cal.App.5th at page 1231, the court considered whether the Ellis Act (Gov. Code, § 7060 et seq.) preempted San Francisco ordinances that required residential landlords to make enhanced relocation payments to tenants before the landlords were permitted to go out of business and evict the tenants in the process. The Ellis Act protects property owners' right to remove their property from the residential rental market. (See Gov. Code, § 7060, subd. (a).) The city argued that a facial challenge to the relocation payment ordinances was improper "given the range of potential mitigation payments possible" and because the plaintiffs had not attempted to show that all or most landlords would be unable to exercise their Ellis Act rights if the ordinances were upheld. (*Coyne*, at p. 1232.) The appellate court rejected the argument, holding its decision invalidating the relocation payment ordinances did not depend on any particular application of the ordinances or particular amount of required relocation payments. (*Ibid.*) Rather, the court concluded "the City's enhanced relocation payment regulations are on their face preempted as categorical infringements which impose a prohibitive price on a landlord's right to exercise his rights to go out of the residential rental business." (*Ibid.*)

Similarly here, as we will explain, section 1806(b)(C) imposes a categorical infringement on a landlord's right under the Costa-Hawkins Act to set rent on an exempt unit at whatever rate the landlord chooses. Thus, it matters not that the amount of required relocation assistance is not yet ascertainable. In addition, the fact that some tenants will not move if their rent is

Because we would reach the same outcome no matter which standard applies, we need not address the issue.

raised does not mean there is not "a total and fatal conflict" between the Costa-Hawkins Act and section 1806(b)(C). (*T-Mobile West LLC v. City and County of San Francisco, supra,* 6 Cal.5th at p. 1117, fn. 6.) For those tenants who *are* "displaced from [their] Rental Unit[s] due to inability to pay Rent increases," landlords will incur the obligation to pay relocation assistance under section 1806(b)(C). Accordingly, the issue is ripe for petitioners' facial challenge.

As to that challenge, petitioners assert that just as Measure H could not impose a cap on rent increases for exempt units without running afoul of the Costa-Hawkins Act, neither may it impose penalties in the form of relocation assistance to discourage landlords from exercising their right under the Act to raise the rent on exempt units. Petitioners contend the relocation assistance requirement under section 1806(b)(C) frustrates the purpose of Civil Code section 1954.52, which is to permit landlords to raise rents on exempt units to their fair market value.

Respondents correctly point out that the relocation assistance requirement does not directly conflict with the right to raise rents, because nothing in section 1806(b)(C) constrains landlords from setting the rent on exempt units whenever they want and at whatever rate they choose. *Bullard v. San Francisco Residential Rent Stabilization Bd.* (2003) 106 Cal.App.4th 488 (*Bullard*) presents an example of a direct conflict. There, the court addressed whether the Costa-Hawkins Act preempted a rent control ordinance that required a landlord who evicted a tenant in order to move into the tenant's unit to offer the tenant another unit, if one was vacant, at a specified rate. (*Id.* at pp. 489-493.) The court held that the "rent control ordinance, by

purporting to limit the amount of rent a landlord may charge for a replacement unit following an owner move-in eviction, directly contradicts" and was thus preempted by the Costa-Hawkins Act's vacancy decontrol provision allowing landlords to establish the initial rental rate for a rental unit. (*Id.* at pp. 492-493, citing Civ. Code, § 1954.53, subd. (a).)

But *Palmer/Sixth Street Properties, L.P. v. City of Los Angeles* (2009) 175 Cal.App.4th 1396 (*Palmer/Sixth*) dealt with a local ordinance that had indirect effects similar to those engendered by Measure H. That ordinance required developers of residential units to build a certain number of "affordable dwelling units" to be rented at specified below-market rates. (*Id.* at pp. 1400-1401.) The ordinance further provided that a developer could avoid compliance with this affordable housing requirement by paying an "in lieu" fee that the city would use to build affordable housing units elsewhere. (*Ibid.*) The appellate court held the Costa-Hawkins Act preempted the affordable housing requirement because it was "hostile or inimical to Civil Code section 1954.53 by denying [the developer] the right to establish the initial rental rates for the affordable housing units that are required to be built under [the ordinance]."[18] (*Palmer/Sixth*, at p. 1410.) The court rejected the city's argument that the alternative in lieu fee did not conflict with the Costa-Hawkins Act. (*Id.* at p. 1411.) The court explained the in lieu fee was "inextricably intertwined" with the affordable

---

[18] The Legislature has since adopted legislation authorizing cities and counties to adopt ordinances imposing affordable housing requirements as a condition of receiving authorization to develop residential housing units. (See Gov. Code, § 65850, subd. g added by Assem. Bill No. 1505, 2017-2018 Reg. Sess.)

housing requirement and thus encompassed by its preemption. (*Id.* at pp. 1411-1412.)

The relocation assistance requirement under section 1806(b)(C) operates similarly to the in lieu fee in *Palmer/Sixth*. Like the ordinance in *Palmer/Sixth*, the relocation assistance requirement financially penalizes landlords for exercising their rights under the Costa-Hawkins Act. Even if imposing an obligation to pay relocation assistance is not a direct restriction on a landlord's ability to set the rent, the money a landlord must pay in relocation assistance reduces the amount of income the landlord receives from the rental property. The Costa-Hawkins Act was meant to rein in rent control by allowing landlords to raise the rents on exempt units to their fair market value. (*NCR Properties*, *supra*, 89 Cal.App.5th at p. 47; *Apartment Assn. of Los Angeles County*, *supra*, 173 Cal.App.4th at p. 30.) The relocation assistance requirement counteracts that purpose by protecting tenants, at landlords' expense, from the free market. However worthy and laudable that goal of Measure H is, state law provides for a different purpose. (See *Coyne*, *supra*, 9 Cal.App.5th at p. 1231 ["A property owner's lawful decision to withdraw from the rental market may not be frustrated by burdensome monetary exactions from the owners to fund the City's policy goals."].) Because its effect is to frustrate the purpose of the Costa-Hawkins Act, section 1806(b)(C) is preempted. (See *Chevron U.S.A., Inc. v. County of Monterey*, *supra*, 70 Cal.App.5th at p. 172 [local regulation cannot frustrate purpose of state law]; accord, *Great Western Shows, Inc. v. County of Los Angeles*, *supra*, 27 Cal.4th at p. 868; *AIDS Healthcare Foundation*, *supra*, 101 Cal.App.5th at p. 88.)

d. The relocation assistance requirement does not fall within the Costa-Hawkins Act's savings clause

Respondents contend the Costa-Hawkins Act does not preempt the relocation assistance requirement under section 1806(b)(C), because providing relocation assistance for tenants who are unable to pay lawfully increased rent falls within the Act's savings clause. That reservation of authority in Civil Code section 1954.52 states, "Nothing in this section shall be construed to affect the authority of a public entity that may otherwise exist to regulate or monitor the basis for eviction." (Civ. Code, § 1954.52, subd. (c).) The Costa-Hawkins Act thus expressly carves out from its preemptive effect local regulation of the "basis for eviction." (Civ. Code, § 1954.52, subd. (c); see *id.*, § 1954.53, subd. (e) [near-identical savings clause in Costa-Hawkins Act's vacancy decontrol provisions preserving the authority of local governments "to regulate or monitor the *grounds for eviction*," italics added]; see *DeZerega v. Meggs, supra*, 83 Cal.App.4th at p. 40 ["The Act explicitly disclaims any effect on the power of local governments to regulate evictions."].) Contrary to respondents' contention, this provision does not save the relocation assistance requirement from preemption.

"Generally speaking, a savings clause preserves some preexisting legal authority from the effect of some newly enacted legal authority that contains the savings clause. 'Saving clauses are usually strictly construed.'" (*City of Dana Point v. California Coastal Com.* (2013) 217 Cal.App.4th 170, 195; accord, *Coyne, supra*, 9 Cal.App.5th at p. 1231 ["savings clauses . . . 'are usually strictly construed'"].) "[C]ourts have refused to interpret savings clauses in a manner that would authorize activity that

63

directly conflicts with the statutory scheme containing the savings clause.' " (*Coyne*, at p. 1231; see *Action Apartment*, *supra*, 41 Cal.4th at p. 98 [characterizing as "narrowly focused" the savings clause of the Costa-Hawkins Act's vacancy decontrol provisions].)

The relocation assistance requirement does not concern the regulation of a "basis for eviction." (Civ. Code, § 1954.52, subd. (c).) A "basis for eviction" is properly understood as a ground or reason for eviction, such as a breach of the tenant's duties to the landlord or the landlord's withdrawal of the unit from the rental housing market. (See *Birkenfeld*, *supra*, 17 Cal.3d at pp. 147-148; *SFAA IV*, *supra*, 104 Cal.App.5th at pp. 1224-1225, 1235.) The requirement for a landlord to pay relocation assistance when a tenant must vacate the unit in response to a lawful rent increase is not a basis for any eviction. And although the tenant's failure to pay the increased rent would constitute a basis for eviction (see Code Civ. Proc., § 1161, subd. (2)), as discussed, the Costa-Hawkins Act prohibits local regulation that conflicts with a landlord's right to impose the rent increase.

In *Bullard*, *supra*, 106 Cal.App.4th at page 491, the court rejected the argument that an ordinance restricting the rent a landlord could charge for a replacement unit after the tenant was evicted for an owner move-in constituted regulation of a "ground[] for eviction" for purposes of the analogous savings clause under the Costa-Hawkins Act's vacancy decontrol provisions. (See Civ. Code, § 1954.53, subd. (e).) The court explained, "The ground for eviction was that Landlords sought to recover possession of a unit for use as their principal residence. The requirement that they offer another unit at a regulated rent was a condition imposed by the rent control ordinance on their recovery of possession, but it

cannot be deemed in any ordinary sense of the term a 'ground' for the eviction." (*Bullard*, at p. 491; see also *id.* at p. 492 ["Had the Legislature intended to preserve local authority to control rent following evictions, we do not believe it would have spoken in terms of the 'grounds for eviction,' which simply do not include the amount of rent a landlord may charge after evicting a tenant."].)  Here, the relocation assistance requirement is a condition imposed on landlords in response to their increasing the rent in a manner that causes the tenant to vacate the unit.  Even though the requirement applies in conjunction with a landlord recovering possession of a vacated unit, it alone does not constitute a "basis" for eviction in any ordinary sense of that term.

Respondents contend that the relocation assistance requirement under section 1806(b)(C) nevertheless falls within the savings clause because it "regulates the basis for evicting a tenant who is unable to pay a large rent increase, because that increase can result in a constructive eviction."  However, the relocation assistance requirement does not pertain to, much less regulate, constructive evictions.  First, the savings clause refers to evictions, not constructive evictions, and savings clauses are typically strictly construed.  (*Coyne, supra,* 9 Cal.App.5th at p. 1231.)  Second, even if we assume the savings clause permits local regulation of the basis for constructive evictions, we disagree with the premise that tenants who are displaced because they cannot pay lawful, good faith rent increases are "constructively evicted."

"An eviction is constructive if the landlord engages in acts that render the premises unfit for occupancy for the purpose for which it was leased, or deprive the tenant of the beneficial

65

enjoyment of the premises." (*Cunningham v. Universal Underwriters* (2002) 98 Cal.App.4th 1141, 1152; accord, *Erlach v. Sierra Asset Servicing, LLC* (2014) 226 Cal.App.4th 1281, 1299-1300 ["Any interference by the landlord that deprives the tenant of the beneficial enjoyment of the premises or renders the premises unfit for the purposes for which they are let amounts to a constructive eviction if the tenant so elects and vacates within a reasonable time."]; see also *Stoiber v. Honeychuck* (1980) 101 Cal.App.3d 903, 926 ["Abandonment of premises by the tenant within a reasonable time after the wrongful act of the landlord is essential to enable the tenant to claim a constructive eviction."]; Friedman et al., Cal. Practice Guide: Landlord-Tenant (The Rutter Group Aug. 2025) ¶ 7:289 ["Generally, a constructive eviction results only from a landlord's *material breach* of the rental agreement . . . usually some form of adverse conduct that *substantially* interferes with the beneficial use of the premises."].) When a constructive eviction occurs, "the tenant is relieved of the obligation to pay rent and may sue for damages." (*Andrews v. Mobile Aire Estates* (2005) 125 Cal.App.4th 578, 590; accord, *Kulawitz v. Pacific Woodenware & Paper Co.* (1944) 25 Cal.2d 664, 670.) A landlord's lawful, good faith rent increase under the Costa-Hawkins Act plainly does not entitle the tenant to stop paying rent and sue the landlord for damages. Imposing such a lawful rent increase, even on a tenant who is unable to pay the increased amount, is not a constructive eviction.

Respondents rely on *San Francisco Apartment Assn. v. City and County of San Francisco* (2022) 74 Cal.App.5th 288, 294 (*SFAA III*) and *Mak v. City of Berkeley Rent Stabilization Bd.* (2015) 240 Cal.App.4th 60, 69-70, which held local measures were not preempted by the Costa-Hawkins Act's vacancy decontrol

scheme because they were permissible regulations of bases or grounds for eviction within the meaning of Civil Code section 1954.53, subdivision (e).  Both cases are distinguishable because the ordinances at issue targeted "bad faith, pretextual" conduct by landlords to get around local eviction regulations.  (*SFAA III*, at p. 295; see *Mak*, at pp. 63, 69 [regulation at issue imposed a sanction for landlord's "subterfuge" and "transparent attempt to circumvent the provisions of local rent control provisions"].)

The San Francisco ordinance at issue in *SFAA III* made it unlawful for a landlord to seek to recover possession of a rental unit that was exempt from rent control "by means of a rental increase that is imposed in bad faith to coerce the tenant to vacate the unit in circumvention of the city's eviction laws." (*SFAA III*, *supra*, 74 Cal.App.5th at pp. 290-291.)  Landlord interest groups sued, arguing the regulation was preempted by the Costa-Hawkins Act because it regulated the rent a landlord could charge on exempt properties.  (*Id.* at p. 291.)  The court disagreed, holding the ordinance was a "reasonable exercise of the city's authority to regulate the grounds for eviction" in that it prevented landlords "from designating as rent an artificial sky-high amount that the landlord does not intend to collect but intends to cause the tenant to vacate the unit voluntarily or by eviction for nonpayment of the unrealistic figure."  (*Id.* at pp. 291-292.)  In particular, the ordinance required a finding that the landlord intended to coerce the tenant to move.  (*Id.* at p. 292.)  The court found the regulation's targeting of bad faith, pretextual rent increases to avoid local eviction regulations fit within the reservation of local authority to regulate the grounds for eviction under Civil Code section 1954.53, subdivision (e).  (*SFAA III*, at p. 294.)

In *Mak*, the court upheld a local measure limiting the initial rent of a new tenant where the previous tenant vacated the unit after the landlord took action to terminate the tenancy with a bad faith assertion of the landlord's intent to occupy the premises. (*Mak*, *supra*, 240 Cal.App.4th at pp. 69-70.) The court determined that the regulation acted as a sanction for landlords' misuse of landlord-move-in notices to displace tenants so rent could be raised under the Costa-Hawkins Act's vacancy decontrol provisions and, so viewed, was " 'a permissible regulation of "the grounds for eviction" ' " within the meaning of Civil Code section 1954.53, subdivision (e). (*Mak*, at p. 69.) The court noted that in *Action Apartment*, the California Supreme Court indicated that in enacting the Costa-Hawkins Act vacancy decontrol provisions, " '[t]he Legislature was well aware . . . that such vacancy decontrol gave landlords an incentive to evict tenants that were paying rents below market rates. [Citation.] Accordingly, the statute expressly preserves the authority of local governments "to regulate or monitor the grounds for eviction." ' " (*Mak*, at p. 64, quoting *Action Apartment*, *supra*, 41 Cal.4th at pp. 1237-1238; see also Civ. Code, § 1954.53, subd. (e).) Indeed, in discussing the vacancy decontrol provisions of the Costa-Hawkins Act, *Action Apartment* characterized the relevant savings clause as " 'a strong statement that the state law establishing vacancy decontrol is not meant to affect the authority of local governments to monitor and regulate the grounds for eviction, *in order to prevent pretextual evictions*.' " (*Action Apartment*, at p. 1245, italics added; accord, *Apartment Assn. of Los Angeles County*, *supra*, 173 Cal.App.4th at pp. 24-25.)

Under section 1806(b)(C) of Measure H, a landlord's requirement to provide relocation assistance is not limited to

instances where the landlord raises the rent in bad faith in order to force tenants to move out, but rather applies to all lawful increases of the rent to fair market value.  The relocation assistance requirement is thus distinguishable from the ordinance in *SFAA III* that was solely concerned with bad-faith, coercive conduct by landlords.  And unlike the measure at issue in *Mak*, the relocation assistance requirement is not geared toward preventing pretextual evictions intended to circumvent rent control.  The relocation assistance requirement applies only to exempt units, not to units covered by rent control, and thus landlords do not need existing tenants to move out to be able to raise the rent to market rates.

A comparison of the Costa-Hawkins Act savings clause in Civil Code section 1954.52, subdivision (c), with a savings clause in the Ellis Act further supports the conclusion that Measure H's relocation assistance requirement does not fall within the Costa-Hawkins Act savings clause.  As discussed, the Ellis Act "is designed 'to permit landlords to go out of business' " (*Drouet v. Superior Court* (2003) 31 Cal.4th 583, 595) and regulates the eviction of tenants as landlords seek to do so (*San Francisco Apartment Assn. v. City and County of San Francisco*, *supra*, 3 Cal.App.5th at p. 478).  The Ellis Act's savings clause provides that " 'nothing in this chapter . . . [d]iminishes or enhances any power in any public entity to *mitigate any adverse impact* on persons displaced by reason of the withdrawal from rent or lease of any accommodations." (Gov. Code, § 7060.1, subd. (c), italics added.)  Based on this provision, courts have held that municipalities may require payment of reasonable relocation assistance for displaced tenants as a mitigation measure that does not conflict with the Ellis Act.  (See *2710 Sutter Ventures,*

69

*LLC v. Millis* (2022) 82 Cal.App.5th 842, 853-854; *Pieri v. City and County of San Francisco* (2006) 137 Cal.App.4th 886, 892-894.)  But the Ellis Act's reservation of authority to local governments to "mitigate any adverse impact" on displaced tenants is plainly different from and broader than the Costa-Hawkins Act's provision reserving local authority to regulate the bases for eviction.

Because the relocation assistance requirement under section 1806(b)(C) of Measure H does not constitute regulation of a basis for eviction within the meaning of Civil Code section 1954.52, subdivision (c), that provision does not save the requirement from preemption by the Costa-Hawkins Act.

3.  *The notice requirement under sections 1803(cc) and 1806(a)(1) for evictions for nonpayment of rent is preempted by the Unlawful Detainer Act*

When municipalities enact measures that impose procedural barriers to the state statutory scheme for summary eviction proceedings, those measures are preempted.  (*Birkenfeld, supra*, 17 Cal.3d at pp. 149, 151; *SFAA IV*, 104 Cal.App.5th at 1237-1238; see generally *Chevron, supra*, 15 Cal.5th at p. 142 [if local legislation conflicts with state law, "it is preempted by such law and void"].)  Petitioners argue that Measure H includes a notice requirement that is preempted by state law—the Unlawful Detainer Act (Code Civ. Proc., § 1159 et seq.)—insofar as it imposes an additional cure period beyond the period required under state law before a landlord may pursue an eviction for nonpayment of rent.  Under Code of Civil Procedure section 1161, subdivision (2), landlords must serve a three-day notice to pay rent or quit the premises before proceeding with unlawful detainer actions against tenants who have not paid rent or

vacated the premises. Petitioners contend sections 1803(cc) and 1806(a)(1) of Measure H impose a notice requirement that guarantees tenants an extra period of time to cure any alleged nonpayment of rent. Petitioners assert these provisions are preempted because they both contradict and enter a field fully occupied by state law. We agree the notice requirement as it pertains to evictions for nonpayment of rent is preempted because it contradicts Code of Civil Procedure section 1161, subdivision (2).[19]

The Unlawful Detainer Act establishes procedures for resolving disputes between landlords and tenants regarding the right to possess real property. (*Stancil v. Superior Court* (2021) 11 Cal.5th 381, 394.) Unlawful detainer proceedings are summary in nature, providing for shorter timelines and a more limited scope than standard civil actions. (*Id.* at p. 390; *Barela v. Superior Court* (1981) 30 Cal.3d 244, 249.) These proceedings seek to balance tenants' occupancy rights against landlords' rights to earn income. (*Stancil*, at p. 390.) They also demand strict procedural compliance. (*Ibid.*) Code of Civil Procedure section 1161 sets forth the circumstances under which a tenant is guilty of unlawful detainer and may be evicted. (Code Civ. Proc., § 1161, subds. (2)-(4); *Stancil*, at p. 395.) For evictions based on

---

[19] Because the notice requirement is preempted because it contradicts state law, we need not decide whether it is also preempted because state law fully occupies the field of landlord-tenant notification timelines such that any local extension of a statutory notice period is preempted. (See *SFAA IV*, *supra*, 104 Cal.App.5th at pp. 1238-1240 [holding ordinance requiring additional notice and cure period was preempted because "state statutory law has fully occupied the field of landlord-tenant notification timelines"].)

the nonpayment of rent, a landlord must serve the tenant with a three-day notice to pay rent or quit the premises before filing an unlawful detainer complaint.  (§ 1161, subd. (2); see *Eshagian v. Cepeda* (2025) 112 Cal.App.5th 433, 457.)

Measure H provides that before a landlord may initiate an action to terminate a tenancy or endeavor to recover possession of a rental unit based on a tenant's failure to pay rent, the landlord must provide the tenant with a "Written Notice to Cease," defined as "[a] written notice provided by a Landlord that gives a Tenant an opportunity to cure an alleged violation or problem prior to initiating legal proceedings to terminate tenancy." (§§ 1803(cc), 1806(a)(1).)  "Any Written Notice to Cease must:  [¶] (1) Provide the Tenant a reasonable period to cure the alleged violation or problem; [¶] (2) Inform the Tenant that failure to cure may result in the initiation of eviction proceedings; [¶] (3) Inform the Tenant of the right to request a reasonable accommodation; [¶] (4) Inform the Tenant of the contact number for the Rental Board; and [¶] (5) Include a specific statement of the reasons for the Written Notice to Cease with specific facts to permit a determination of the date, place, witnesses and circumstances concerning the reason for the eviction[;] [¶] [and] (6) Where a breach of Lease is alleged, inform the Tenant what Lease provision has been breached and what the Tenant must do in order to cure the breach."[20]  (§ 1803(cc).)

Section 1806(a)(1) provides that in the event a tenant has failed to pay rent, the landlord may not "take action to terminate

---

[20]    Petitioners challenge only the notice requirement's effect on the timelines for eviction procedures and do not raise a preemption challenge to the required content of a Written Notice to Cease under section 1803(cc).

[the] tenancy, . . . including but not limited to . . . *serving any . . . eviction notice*," unless "[t]he Tenant has failed, *after receiving a Written Notice to Cease,* to pay the Rent." (§ 1806(a)(1), italics added.)  A landlord's failure to serve the tenant with the Written Notice to Cease constitutes a complete affirmative defense in an unlawful detainer or other action by the landlord to recover possession of the rental unit.  (§§ 1806(*l*), 1817(d).)

Petitioners correctly note that a landlord must serve a nonpaying tenant with a Written Notice to Cease—which, according to its definition under section 1803(cc)(1), must provide a "reasonable period" to cure the nonpayment of rent—*before* the landlord may "serv[e] any . . . eviction notice," including a three-day notice under Code of Civil Procedure section 1161, subdivision (2).  They assert that this requirement for an additional cure period for the nonpayment of rent—that is, the "reasonable period" described by section 1803(cc)(1)— necessarily extends the statutory requirement for three days' notice. Respondents do not disagree that service of a Written Notice to Cease must precede a three-day notice but contend that a landlord may serve the Written Notice to Cease essentially concurrently with, or seconds before, a three-day notice.  In other words, they contend, the "reasonable period" described by section 1803(cc)(1) can run *simultaneously* with the three-day notice period under Code of Civil Procedure section 1161, subdivision (2), and does not *extend* it.[21]

---

[21]    We granted interveners' request for judicial notice of regulations issued by the Rental Board pertaining to the just cause eviction requirements under Measure H section 1806(a). Interveners assert these regulations show the body responsible

73

In our view, respondents' reading of Measure H is strained and unpersuasive. The requirement to serve a Written Notice to Cease "before" a three-day notice cannot be read to mean a requirement to serve it "concurrently" with the three-day notice. We agree with petitioners that sections 1803(cc) and 1806(a)(1) of Measure H are reasonably read together to require that a landlord serve a Written Notice to Cease on a tenant and then allow the tenant a reasonable period to cure the nonpayment of rent before a three-day notice may be served or any other action taken to institute eviction proceedings. This additional cure period thus extends the three days' notice required under the Unlawful Detainer Act.

Given this conclusion, we turn to whether Measure H's notice requirement is preempted using the rubric set forth in the

for implementing Measure H does not read its provisions to mandate any notice that extends the notice timelines under Code of Civil Procedure section 1161. (See *Rental Housing Assn. of Northern Alameda County v. City of Oakland* (2009) 171 Cal.App.4th 741, 763-764 [rent board regulations demonstrated any vagueness in ordinance regarding the timing of a tenant's opportunity to cure had been clarified and corrected].) But the regulations do not confirm one way or another whether the Rental Board interprets the challenged notice requirement in a manner that conflicts with Code of Civil Procedure section1161, subdivision (2). While the regulations describe a Written Notice to Cease, as defined under section 1803(cc), as something "that was previously issued with the notice of termination of tenancy" under section 1161, thus implying concurrent service of the two notices, that description is only applicable when a landlord is seeking to evict a tenant based on a breach of lease or nuisance under section 1806(a)(2) and (3), as opposed to the nonpayment of rent under section 1806(a)(1).

seminal case *Birkenfeld, supra*, 17 Cal.3d 129. *Birkenfeld* concerned a landlord class action challenge to two separate provisions in an initiative amendment to the City of Berkeley's charter, one of which the Supreme Court found was preempted and the other not. (*Id.* at p. 135.) The Supreme Court held that a local eviction protection does not conflict with the unlawful detainer statutes if it serves a distinct purpose. (*Id.* at p. 149.) "The purpose of the unlawful detainer statutes is *procedural*. The statutes implement the landlord's property rights by permitting him to recover possession once the consensual basis for the tenant's occupancy is at an end." (*Ibid.*, italics added.) By contrast, a local measure eliminating particular grounds for eviction, for instance, is a limitation upon the landlord's property rights under the police power, creating a *substantive* ground of defense in unlawful detainer proceedings. (*Ibid.*) Thus, the unlawful detainer statutes did not preempt the provision in the Berkeley charter amendment limiting the grounds for eviction and making substantive defenses available to the tenant. (*Ibid.*)

On the other hand, the *Birkenfeld* court explained, the other challenged provision of the charter amendment "requir[ing] a landlord to obtain a certificate of eviction before seeking to recover possession of a rent-controlled unit invalidly conflicts with sections 1159 through 1179a of the Code of Civil Procedure, which provide landlords with a summary procedure for exercising their rights of repossession against tenants. . . . Unlike the limitations imposed by the charter amendment . . . upon the grounds for eviction, which can affect summary repossession proceedings only by making substantive defenses available to the tenant, the requirement of a certificate of eviction raises

75

procedural barriers between the landlord and the judicial proceeding." (*Birkenfeld*, *supra*, 17 Cal.3d at p. 151.)

Petitioners contend that, like the eviction certificate requirement in *Birkenfeld*, Measure H sections 1803(cc) and 1806(a)(1) "layer[] on additional procedural requirements, which are preempted." Respondents counter that Measure H "imposes a *substantive* regulation of tenancies rather than eviction procedure: a tenant cannot be deemed to have failed to pay rent until after receiving the notice and information provided by a Written Notice to Cease." They rely on the fact that Measure H provides that in the event a tenant is behind on rent, "[n]o Landlord shall take action to terminate any tenancy, or endeavor to recover possession of a Rental Unit . . . . unless . . . [t]he Tenant has failed, after receiving a Written Notice to Cease, to pay the Rent to which the Landlord is legally entitled." (§ 1806(a)(1).)

In *SFAA IV*, *supra*, 104 Cal.App.5th at pages 1223, 1228-1231, the court applied the *Birkenfeld* substantive-procedural rubric to determine whether state law preempted a San Francisco ordinance that created a longer notice timeline for landlords pursuing at-fault evictions. That ordinance required that for certain at-fault evictions, a landlord " 'shall prior to serving the [statutory] notice to vacate provide the tenant a written warning and an opportunity to cure.' " (*Id.* at p. 1225.) Further, it stated these grounds for at-fault eviction " 'shall not apply unless the violation is not cured within ten days after the landlord has provided the tenant a written warning that describes the alleged violation and informs the tenant that a failure to correct such violation within ten days may result in the initiation of eviction proceedings.' " (*Id.* at p. 1226.) A landlord association sued,

76

arguing state law preempted the ordinance because it created an impermissible conflict with section 1161 of the Code of Civil Procedure by giving tenants an additional 10-day notice and cure period, so they had a minimum of 13 days to cure instead of three days. (*SFAA IV*, at pp. 1226, 1228.) The landlord association argued the ordinance was procedural under the *Birkenfeld* framework because it extended the notice period under Code of Civil Procedure section 1161, while the city argued the ordinance was substantive because it limited the grounds for eviction as an appropriate exercise of the city's police power and therefore was not in conflict with section 1161. (*SFAA IV*, at p. 1230.)

The court in *SFAA IV* noted " ' "the distinction between procedure and substantive law can be ' "shadowy and difficult to draw" in practice' " ' " because "law can be substantive but still have a 'procedural *impact.*' " (*SFAA IV, supra,* 104 Cal.App.5th at p. 1230.) But the court ultimately agreed with the landlord association that the ordinance's "extension of the timeline for notice and opportunity to cure is entirely procedural. It also imposes a specific procedural requirement: landlords must affirmatively act by providing a written warning after good cause for eviction has been demonstrated but before notice of eviction can be given under [Code of Civil Procedure] section 1161. . . . [T]his process creates a procedural barrier precluding relief." (*SFAA IV,* at pp. 1234-1235.) The court thus held that the ordinance was preempted because it "plainly prohibits a landlord from proceeding under the state statutory timeline by requiring the additional 10-day warning and cure period." (*Id.* at p. 1237.)

Sections 1803(cc) and 1806(a)(1) of Measure H similarly impose a procedural requirement that landlords provide a Written Notice to Cease to tenants and afford an additional

77

"reasonable period" to cure the nonpayment of rent that extends the timeline enshrined in Code of Civil Procedure section 1161, subdivision (2). The requirement is not substantive merely because the ordinance is worded to provide that landlords may not take action to terminate a tenancy unless the tenant has failed to pay the outstanding rent after receiving a Written Notice to Cease. (§ 1806(a)(1).) The ordinance also provides that a landlord's failure to serve the tenant with a Written Notice to Cease and allow for the cure period to run constitutes a complete affirmative defense in an unlawful detainer action. (§§ 1806(*l*), 1817(d); Pasadena Rental Housing Board Regulations, ch. 4, art. I, § (B)(4)(a).) That is the epitome of a "procedural barrier[] between the landlord and the judicial proceeding." (*Birkenfeld*, *supra*, 17 Cal.3d at p. 151; cf. *San Francisco Apartment Assn. v. City and County of San Francisco* (2018) 20 Cal.App.5th 510, 512, 518 [ordinance providing a defense to certain evictions if a child or educator resided in the unit and "the effective date of the notice of termination of tenancy falls during the school year" was not procedural despite its impact on timing of eviction because "it does not require landlords to provide written notice or to do any other affirmative act"]; but see *Rental Housing Assn. of Northern Alameda County v. City of Oakland* (2009) 171 Cal.App.4th 741, 762-763 [ordinance requiring landlord, before serving statutory notice to terminate tenancy, to provide warning notices to tenant to cease violation of term of tenancy (not including nonpayment of rent) and giving opportunity to cure violation was not preempted by unlawful detainer statutes; notice requirements regulated substantive grounds for eviction because if tenant ceased offending conduct once notified by the landlord, there was no good cause to evict].)

Measure H's requirement that landlords serve a Written Notice to Cease and allow an additional cure period as a condition precedent for eviction for nonpayment of rent is a procedural requirement that conflicts with the timeline under Code of Civil Procedure section 1161, subdivision (2). Accordingly, it is preempted.

## DISPOSITION

The judgment is reversed. The superior court is directed to enter a new judgment that (1) grants petitioners relief on their claims that state law preempts the relocation assistance requirement under section 1806(b)(C) and the notice requirement for evictions and other proceedings based on nonpayment of rent under sections 1803(cc) and 1806(a)(1) and (2) denies all other previously denied relief on petitioners' claims. The parties are to bear their own costs on appeal.


STONE, J.

We concur:



MARTINEZ, P. J.



SEGAL, J.